THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOAQUIN GONZALEZ, Defendant-Appellant.

First District (2nd Division)   No. 86—1176

Opinion filed September 27, 1988.—Rehearing denied October 31, 1988.

Barbara Kamm, Michael J. Pelletier, and Steven Clark, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, James E. Fitzgerald, and Aaron Iverson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant Joaquin Gonzalez was indicted with Julio Serrano for the murders by shooting of Alvin Reed and Francisco Marrero and

for armed violence based on the shooting. The trial court denied the defendant's motion for a severance, and after a joint bench trial, the defendant was found guilty of all charges and sentenced to natural life for the murders. Serrano was found not guilty of all charges.

The case against the defendant was based on identification by two witnesses, Yolanda Serrano and Leon Woods. Yolanda Serrano testified that on April 9, 1985, she was 16 years old and living with a friend at 1856 North Humboldt in Chicago. She was a member of the Latin Queens, and her brother Julio and the defendant were members of the Latin Kings. Around 7:45 p.m. she was returning home when she saw the defendant come out of his house and go to the corner. She had known him about 2½ years. She ran behind him to the corner of Courtland and Humboldt and saw her brother Julio arguing with two other men. She could not hear what they were arguing about, but she saw her brother strike one of the men in the face with his fist. The defendant pushed her brother aside, pulled out a gun and fired six times. The two other men fell. Her brother told the defendant he was crazy. Her brother ran one way, and the defendant ran another. She later met both of them when she returned to her apartment. Her brother asked why the defendant had acted as he had, but the defendant did not answer.

She approached the police and identified herself as Maria Sanchez, a name that she had been using. She told them that two black men had shot the victims and fled toward Humboldt Avenue. She said she lied because she knew her brother was innocent and she did not want to get the defendant, a friend and fellow gang member, in trouble. Later, on cross-examination by the defendant's attorney, she admitted that she actually picked out the photos of two other members of the Latin Kings and told the police that they were the killers. She did not recall their names at the time of her testimony. After her brother had been in custody for about four days, she told the police she was at her brother's side during the shooting. On that occasion she remained at the police station overnight.

On further cross-examination by her brother's attorney, she testified that she had seen the slain men, Reed and Marrero, earlier that night and that one of them said something "bad" to her. She told her brother, and they left her apartment together and walked to the corner where Reed and Marrero were standing. After her brother exchanged words with them, the defendant came up from Humboldt Avenue. The State had been paying her living expenses.

Leon Woods lived less than a block from the shooting. He testified that he had been working on his car and had gone to borrow a

friend's tools. As he was approaching the gate to his friend's house, he looked toward the corner of Humboldt and Courtland and saw four males and one female. He was about 15 feet away. It was nighttime, but the area was well lighted. Two of the men had their backs against the wall, and the other two men and the girl were in front of them. He identified the defendant and Serrano as the two men he saw with the girl. He did not know the men, but he might have seen them before. He saw Serrano punching one of the men who was standing against the wall. He saw the defendant push Serrano and the girl aside and start to shoot at the other men. Woods was about 15 feet away at the time. He ran up to his friend's back porch on the first level and saw the two men run past him. He heard Serrano say, "Why in the hell did you do that, man?" They jumped a fence and ran down the alley.

He picked Serrano out of a lineup that night. Two nights later he picked the defendant out of a lineup. At the time of his testimony the State had been paying for his living arrangements for the previous two weeks.

The defendant testified that he was home at the time of the shooting.

■■ The defendant's principal assignments of error concern the cross-examination of Woods and the reception of the State's offer of proof as evidence. He also contends that the court should have conducted a hearing on his post-trial claim of ineffectiveness of counsel, that the mandatory life sentence provision of the statute is unconstitutional and that the murder convictions based on allegations of acts done with a strong probability of death (counts II and IV) and the armed violence convictions (counts V and VI) should be vacated since they arise out of the same facts as the murder convictions based on allegations of intentional killing (counts I and III). The State agrees that the convictions on those counts, II, IV, V and VI, should be vacated. *People v. Mack* (1984), 105 Ill. 2d 103, 473 N.E.2d 880; *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477.

The defendant's claim that the statute is unconstitutional has been decided against the defendant's position by our supreme court in *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059.

In view of the position we take that this case should be remanded for a new trial on other grounds, it is not necessary to pass on the defendant's argument that the court should have conducted a hearing on his post-trial allegation of ineffective assistance of counsel.

■ The defendant first argues that the court committed error by unduly restricting his cross-examination of Leon Woods. An under-

standing of the significance of the cross-examination of Woods requires a more detailed recitation of the evidence. Yolanda Serrano testified that no one other than she and the four men was on the street at the time of the shooting. She did not see a man named Ortiz, and she denied telling the police her brother Phillipe was there during the shooting. Officer O'Grady, however, testified that Yolanda told him that her brother Phillipe had been at the scene but had nothing to do with the shooting. He did not recall her mentioning her brother Julio. Officer Paulnitsky, O'Grady's partner, testified that the police reports indicated that Woods and a man named Ortiz said that Phillipe was in the immediate area of the shooting. Ortiz did not testify.

Officer Guevara, who had known the Serrano family for some time, testified that he showed a book of photographs to Leon Woods after the defendant's arrest and that Woods identified Julio Serrano's picture. He said he called Detective Paulnitsky and mistakenly told him that Woods had identified Phillipe's photograph because he happened to have the book opened to Phillipe's picture at the time of the call. He tried to contact Paulnitsky when he realized his mistake but was unable to do so. He later filed a supplemental report correcting the error.

We point out at this juncture that not only was Yolanda strongly impeached by the fact that she lied to the police twice by telling them first that two blacks, and later two other Latin Kings, had done the shooting, but her story varied on cross-examination from that on direct. On direct examination she said that she followed the defendant to the scene of the shooting. On cross-examination she said she went to the scene with her brother Julio, and the defendant arrived later. In addition, her testimony that her brother and the defendant fled in different directions was contradicted by Woods, who testified that they ran away together. Her testimony that her brother Phillipe was not at the scene was impeached by Officer O'Grady, who said she told him Phillipe was there. On direct examination she never said anything about her encounter with Reed and Marrero.

Her failure to testify to the earlier encounter with Reed and Marrero and to the fact that she told her brother about it and went with him, it may be inferred, was designed to minimize her own and her brother's involvement. Her admission on cross-examination that she told her brother about the words she had with Reed and Marrero and that she went with him could create an inference that she encouraged the original fight and that her brother Julio went looking for the men that had insulted his sister. Similarly, her denial of the presence of Phillipe, it may also be inferred, was prompted by the same desire to

protect someone dear to her that caused her to lie to the police. The witness Ortiz, who allegedly told the police Phillipe was there, was never called nor his absence explained. Because of the inherent weaknesses in Yolanda Serrano's testimony and the question raised in this record about the presence of Phillipe Serrano, Woods' identification of the defendant as the second man was of extreme importance.

Woods testified that he picked out Julio Serrano's picture first and the defendant's sometime later. On cross-examination the following occurred:

"DEFENSE ATTORNEY: Mr. Woods, you went to the police station. Did you?

A. Yes.

Q. You looked at some photo books?

A. Yes.

Q. You looked and picked out a Phillipe Serrano as being involved in this incident?

STATE'S ATTORNEY: Objection to that. I don't know if he knows the name of these people.

THE COURT: Do you know the name of the person you picked out?

THE WITNESS. No.

THE COURT: Sustained.

DEFENSE ATTORNEY: You did pick out a person that you say was involved in the incident?

A. Yes.

Q. You told the police that that was the person that was involved in the incident.

A. Yes.

Q. You don't see that person you first picked out in the courtroom today. Do you?

A. Yes.

Q. You picked someone else besides the man in the sweater. Is that true?

A. Yes.

Q. You picked another person besides the man in the sweater [Serrano]. Is that right?

A. Yes.

Q. But, you don't see that person you picked—

THE COURT: Oh, he already said it is not Serrano.

Q. When did you first pick this man in the sweater Mr. Woods?

A. I think I picked him the same night.

Q. You did not know these people's names. Did you?

A. No."

During the same cross-examination the following occurred:

"Q. How many times were you at the police station?

A. Maybe three times. Three or four times.

Q. Each time did you pick somebody as being involved in the incident?

A. Whenever they showed me some photos or whatever I picked—

Q. How many people did you pick as having been involved, three or four different people?

A. Three people. I picked three people that was involved.

Q. Now, the first person you first picked as being involved in this incident, did he look anything like a man other than the man in the jacket over there with the white tie and shirt [Gonzalez]. Did not look anything like him. Right? The guys you first picked out as being involved in the incident at Humboldt and Courtland did look anything like there at the men over there?

A. The first guy I picked out is one of the men over there.

THE COURT: Come on, Ms. Hillyard. You are not going over the same grounds. Get on with something else please?"

The questioning of Woods discloses a confusing record. But we interpret the trial judge's remarks to mean that he regarded the testimony as an acknowledgment that Woods identified someone other than Julio Serrano and the defendant. Woods had expressly stated that he picked out "three people that were involved." To summarize, Woods identified a third man; O'Grady testified that Yolanda Serrano said Phillipe Serrano was present; Guevara allegedly mistakenly told Paulnitsky that Woods identified Phillipe Serrano; and a missing witness, Ortiz, told the police that Phillipe Serrano was present at the scene. Under all the peculiar circumstances of this case, greater latitude should have been permitted the defendant's attorney. We recognize that some of the questions were confusing and that the defendant's position could have been made more clear to the trial court; but we believe that the remarks of the court were an instruction to the defendant's attorney to desist from any further questions about the identity of the third man. As such, we believe that there was an abuse of discretion. Where the principal issue concerns the identification of the accused, defense counsel should be given wide latitude on cross-examination. *People v. Morris* (1964), 30 Ill. 2d 406, 197 N.E.2d 433.

■ The defendant also argues that the court committed revers-

ible error when it accepted the State's offer of proof as evidence. Mary Grobarcik was a chemist employed by the Chicago Police Crime Detection Laboratory. She had been in court the day before the State rested. The State would not agree to stipulate to her testimony but said the witness could be in court within an hour. The court said it would not wait. The defendant's attorney then called Officer O'Grady and the defendant himself to testify. After their testimony had been completed, Grobarcik was still not present, and the court repeated that it would not wait. The defendant's attorney then made an offer of proof that Mary Grobarcik would testify that she tested swabs taken from the defendant's hands and found them to be negative for gunpowder. The court stated that it accepted the offer of proof and it was "made part of the evidence." When the State asked for clarification, the court said, "I accepted her offer of proof. It's in evidence."

The State then said that it wanted to call Grobarcik, and the court again refused to wait. The State responded by making an offer of proof that Grobarcik would testify that gunshot residue does not adhere after six hours; that the swabs were taken from the defendant 5½ hours after the shooting; and that washing or rubbing the hands or spilling something on the hands would affect the test results. The defendant objected to the offer, and the court said that that offer would also be considered as part of the evidence.

The State now says that the court did not consider its offer as evidence. That was not the position the State took at the trial. The State recognized that when the court said the defendant's offer was in evidence that meant that the court was considering it in determining innocence or guilt. For that reason the State insisted on its own offer of proof. The court expressly said that the "offer of proof in rebuttal is noted and accepted, made a part of the evidence." The remarks of the court, in our judgment, overcome the presumption that, in a bench trial, the court considered only competent and relevant evidence. See *People v. Smith* (1965), 55 Ill. App. 2d 480, 204 N.E.2d 577; compare *People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102.

The State concedes that its offer was inadmissible as was, it correctly contends, the defendant's. But, the State argues, its improper evidence simply nullified the defendant's. We cannot accept that argument. This is not a case where the defendant took a position which constituted a knowing waiver of the right to bar certain evidence. (See *People v. Dowling* (1972), 51 Ill. 2d 370, 282 N.E.2d 696.) His attorney made her offer of proof to make a record, as she told the court. The fact the court saw fit to accept her offer as evidence does not mean she waived any right to examine Grobarcik on anything the

State might seek to introduce. Since it was a denial of due process for the trier of fact to consider evidence untested by cross-examination or contrary to the rules of evidence, reversible error occurred.

We are not unmindful of the fact that this was a bench trial. (*People v. Kline* (1982), 92 Ill. 2d 490, 442 N.E.2d 154.) But it is a fundamental principle that the defendant's rights in a bench trial are the same as they are in a jury trial and that a defendant must be afforded the right to confront the witnesses against him and to subject their testimony to cross-examination. *People v. Hoffman* (1942), 379 Ill. 318, 40 N.E.2d 515.

For these reasons the judgment of the circuit court of Cook County is vacated as to counts II, IV, V and VI and reversed as to counts I and III and remanded for a new trial.

Judgment vacated in part; reversed in part and remanded for new trial.

HARTMAN, P.J., and BILANDIC, J., concur.