THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL G. NELSON, Defendant-Appellant.

First District (1st Division)   No. 1—91—1199

Opinion filed March 2, 1993.—Rehearing denied June 24, 1993.—
Modified opinion filed June 30, 1993.

Michael J. Pelletier and Todd Avery Shanker, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth McCurry, and Michael Latz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendant Paul G. Nelson was charged by indictment number 90—CR—5406 with felony murder of Michael Guzzetta, home inva-

sion and residential burglary (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), 12—11(a)(2), 19—3). Following a bench trial defendant was convicted of murder and home invasion and sentenced to 25 years in the Illinois Department of Corrections on the murder count, and a concurrent six-year sentence on the home invasion count. On appeal defendant alleged that: (1) he was denied a fair trial where the court drew inferences about the effects of PCP on the decedent; (2) he was denied his constitutional right to confront witnesses where the trial court restricted his cross-examination of a State witness; and (3) the Illinois homicide statute is unconstitutional. For the reasons set forth below, we affirm the judgment of the trial court.

The following evidence was presented at trial.

Officer Shaffer testified that on November 26, 1989, he was employed as a Chicago police officer and assigned to the 16th district. He responded to a call of a disturbance and headed to 5658 West Leland Street. Once there, Shaffer was directed by two men standing in front of the building to the basement apartment, where the door was ajar. Shaffer testified that he saw the decedent's bloody body inside the apartment lying nude on the floor. At that time, he spoke with defendant and defendant said that decedent was an intruder. Shaffer also stated that defendant acted nervous and anxious. Shaffer walked into the kitchen where he observed Collen Brueck crying. He stated that Brueck was injured in her head and face, but that he did not observe any injuries to defendant. Shaffer later arrested defendant.

Richard Provax testified for the State that at about 1:30 a.m. on November 25, 1989, he and defendant left a party after heavily drinking. Provax stated that defendant asked him to drive to Collen Brueck's (defendant's girl friend's) home and he did so. Provax drove to her building and double parked his vehicle while defendant went inside the apartment. He stated that after a few minutes he heard a woman scream, parked the vehicle and went inside the apartment. Provax stated that as he entered the apartment, he saw defendant fighting with decedent while Brueck lay in bed. Provax testified that defendant hit Brueck, then continued fighting with decedent inside the kitchen. Provax stated that decedent begged defendant to stop hitting him; Provax then left the apartment and walked out to his vehicle.

Provax testified that he continued to hear noises and went back into the apartment, where he saw the decedent's body lying on the floor in the kitchen. Provax stated that he observed defendant again hit Collen and return to the kitchen, where he punched and

kicked the decedent. Provax stated that defendant asked him to help remove decedent's body to Provax's vehicle, but Provax refused to do so.

Provax returned to his car a second time, then reentered the apartment, where he saw defendant dragging decedent's body toward the kitchen door. He stated that decedent was breathing at that time and that defendant did not hit or kick decedent. Defendant hit Collen and shouted names at her. Provax testified that he never heard defendant threaten to kill decedent on the three occasions that he entered the apartment.

The State questioned Provax about his statement given to police on November 26, 1989, in which he did not mention that a struggle or fight had occurred between defendant and decedent. Provax admitted that he had not mentioned that fact. However, on cross-examination Provax stated that he saw defendant and decedent fighting when he entered the apartment and that both men were standing. The State also produced Provax's grand jury testimony in which he had not mentioned that the decedent and defendant were fighting.

Kirk Duncan, called as a State witness, testified that in early November 1989, he was at defendant's mother's home with Brueck when defendant walked inside the house. Duncan stated that defendant asked him whether he knew Guzzetta (the decedent), to which Duncan replied that decedent was once his roommate. Duncan testified that defendant then said that he did not like Guzzetta and that he would kill Guzzetta the next time that he saw him.

Michael Chambliss, deputy medical examiner for Cook County, testified that he performed an autopsy on decedent. Chambliss stated that decedent was 5 feet 7 inches tall and weighed 136 pounds. He testified that decedent died as a result of multiple blunt trauma injuries to the head. Chambliss further testified that decedent's toxicology report indicated that he had a blood-alcohol level of .085 and a PCP blood level of 29 nanograms per milliliter. Chambliss opined that this was a low level of PCP in the blood stream. He stated that 100 nanograms would be a high PCP blood level. Chambliss stated that there were 640 nanograms per milliliter of PCP in decedent's urine. He opined that PCP normally stays in the body from 7 to 16 hours, and that PCP in the urine does not affect a person as it would if it was in the blood. This is true because PCP in the urine does not affect any particular active centers in the body.

On cross-examination Chambliss stated that he knew about the effects of PCP. He stated that PCP is generally used as an animal tranquilizer, but that humans often ingest the drug. He explained that he had seen PCP cause death in humans. Although Chambliss testified that he was unsure if PCP was classified as a "volatile" drug, in response to a later question by defense counsel he stated that PCP caused mood changes, euphoria and depression. When defense counsel asked Chambliss whether PCP could cause a human user to become aggressive, the prosecution objected and the court sustained the objection, finding that the question was outside Chambliss' expertise. Chambliss was asked by defense counsel whether PCP deadened pain, caused flashbacks, or ignited aggression, the State again objected, and the court also sustained that objection.

Chambliss admitted that he had studied PCP from the point of view of toxicology and what some of the symptoms and signs of PCP are. He also stated that he had read an article of PCP, but the court did not allow defense counsel to ask questions about the article.

Collen Brueck testified that on the evening of November 25, 1989, she and the decedent had been drinking at a bar. Decedent drank beer and whiskey and had been involved in three fights with patrons at the bar. Collen and decedent left the bar and went to her apartment, where they continued to drink, watched television and later had sex. The two fell asleep in the bed.

Brueck testified that about 2:30 a.m. she awoke when defendant pulled decedent from the bed. Defendant began to kick and punch decedent, then pushed his head into a wall. Brueck testified that defendant told decedent "I am going to kill you," and continued to punch and kick decedent into the bathroom area. Decedent begged defendant to stop. Brueck stated that defendant returned to the bedroom, screamed at her, asked her where the drugs were and then hit her across the face. Defendant told her that he had warned her that "if he ever caught her with this hippie he'd kill him." She testified that he then returned to the bathroom and dragged decedent into the kitchen and began stomping him. Brueck stated that she saw Provax in the doorway of her apartment and told him to get defendant out of her house.

Brueck testified that she heard defendant ask Provax to assist him in removing decedent's body from her apartment and that Provax refused to do so. Defendant then dragged decedent's body to the kitchen doorway.

Brueck told the police who arrived on the scene that she had been raped and beaten by the decedent. While at the hospital that evening she also told a detective that she had been raped and beaten by the decedent. She testified that later on the morning of November 26, 1989, she told the police the truth and signed a statement regarding the events. She also stated that she told the true story to the grand jury the following day. In her grand jury testimony she stated that on the night of the incident she awoke and saw defendant beating decedent, but failed to state that she saw defendant pull decedent out of bed.

Brueck testified that before her meeting with defense counsel she visited with defendant in jail and that he told her to "make it a self defense case." She met with defense counsel and told him that she did not know how the fight started between defendant and decedent. However, during cross-examination, Brueck testified that much of her statement to defense counsel was a lie, but that her statements about decedent's drinking and fights that evening were truthful.

The parties stipulated that paramedics Sassana and Wallace would testify that when they arrived at the scene of the crime the decedent displayed no vital signs. The decedent was pronounced dead on arrival at the hospital at 3:11 a.m. November 26, 1989. Wallace would further testify that he examined defendant on November 26, 1989, and defendant neither displayed signs of injury nor complained of any injury.

Defendant testified at trial that Brueck had been his girl friend for six years and that he had not dated other women. He stated that Brueck had accepted his engagement ring. He testified that on the date of the incident he and Brueck were still dating.

Defendant testified that on November 25, 1989, he was very drunk when he went to Brueck's apartment. He arrived there about 2:15 a.m. and found the door slightly open. He testified that he walked inside the apartment, where he saw Brueck in bed and walked over to her. Defendant testified that before he reached the bed decedent hit him in the head and face, then pulled him into the kitchen. While in the kitchen, the two began to fight as Brueck screamed. Decedent fell to the ground, and defendant punched and kicked him several times. Defendant testified that decedent was naked and, after seeing his naked body, he lost control of himself realizing that decedent and Brueck had engaged in sex.

Defendant testified that he remembered hitting Brueck and calling her a bitch and a whore and asking her where the drugs were.

He stated that he saw Provax at the front door and told him to go back to the vehicle. Defendant stated that after that point he remembered very little.

On cross-examination defendant testified that after decedent fell to the kitchen floor, decedent got up and the fighting resumed. He testified that he did not remember telling the police that he hit decedent only one or two times, or that he saw decedent raping Brueck. Defendant testified that as a result of the fight he suffered a bump to the back of his head and a bruise on his chin.

Defendant stated that he never discussed his case with Brueck or Provax and that he never told Brueck to make the case look like one of self-defense, nor did he concoct a rape story.

At the close of the evidence the court rendered its findings, concluding that the reasonable inference to be drawn regarding the narcotics and alcohol was that the decedent was not in any condition to defend himself. The court concluded that defendant invaded Brueck's home and murdered the decedent.

Defendant first argues that he was denied a fair trial where the trial court relied on speculation and extra-evidentiary conclusions regarding the effects of PCP on the decedent. Specifically, defendant contends that there were no facts in the record from which the court could conclude, as it did, that the PCP in the decedent's body rendered the decedent helpless. Defendant asserts that this is particularly true where the court restricted his ability to cross-examine the medical examiner about the effects of PCP on human beings, and that the court looked outside the record to reach its conclusion. The State maintains that the trial court did not indulge in extra-evidentiary speculation, and that there was sufficient evidence in the record upon which the court properly relied in finding that the decedent could not and did not defend himself.

It is fundamental that a fair bench trial is one based on the consideration of only that evidence introduced at trial and reasonable inferences to be drawn therefrom. (*People v. Gonzalez* (1988), 175 Ill. App. 3d 466, 529 N.E.2d 1027.) Further, in a bench trial, there is a rebuttable presumption that the trial court considered only relevant evidence. (*People v. Christiansen* (1987), 116 Ill. 2d 96, 506 N.E.2d 1253.) The trial court is free to accept or reject as much or as little as it pleases of a witness' testimony. (*People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112.) Any deliberations utilizing evidence based on private speculation of the trial court, untested by cross-examination or the rules of evidence, constitute a

denial of due process of law. *People v. Nelson* (1974), 58 Ill. 2d 61, 317 N.E.2d 31.

In this case, the trial court clearly stated how it reached its conclusion that decedent was unable to defend himself:

"The medical examiner talked about the extent of the beating. We know the cause of death to have been injury to the head from blunt trauma, and I think the fact of the matter is that the defendant beat the victim to death. I don't think there is any question about that. He beat him to death. A big deal was made about the fact that this victim had narcotics and alcohol in his blood. I think this court in determining how on earth the victim in a sense allowed himself to be beat this savagely. It's a reasonable inference from the evidence that he was not in any condition in fact to defend himself.

If one wants to take the view that these narcotics and the alcohol in his blood were high, as I believe defense counsel managed to and rightfully so, he really probed into that, but at some point the doctor did indicate that he felt what he had found was 'a high dose.' I think that might explain one of the curious questions this case presented and that is the complete lack of any substantiated injury to the defendant and the brutal beating sustained by the victim. One can infer that he was not in any condition to defend himself."

■ The court's reasoning here suggests that the court drew a reasonable inference from the evidence. The medical examiner testified that the cause of decedent's death was blunt trauma to the head. He also testified that the decedent had received a severe beating. The conclusions in the toxicology report prepared by the examiner showed that the decedent had a blood-alcohol level of .085, a PCP level of 29 nanograms in his bloodstream, and 640 nanograms in his urine at the time of death. Further, the paramedics who examined defendant after the incident determined that defendant had suffered no injuries, and defendant himself admitted on cross-examination that a bruise to his chin may have been acne. Moreover, the testimony of Provax and Brueck, although conflicting and inconsistent, was sufficient for the court to infer that the decedent was beaten by the defendant and that drugs and alcohol in his bloodstream hindered decedent from defending himself. Although Provax did not mention in his grand jury testimony that the defendant and decedent were fighting when he walked into the apartment, he did testify that he saw defendant beating decedent. Moreover, at trial he testified that when he entered Brueck's apart-

ment he saw defendant fighting with decedent in one room and continuing that fight into the kitchen.

Brueck testified before the grand jury that when she awoke on the night of the incident defendant was beating decedent. Although she failed to state in her grand jury testimony that she saw the defendant pull decedent out of bed, at trial she stated that on the night of the incident she was awakened when defendant pulled decedent out of the bed and pushed decedent's head into a wall. She testified that defendant continued to punch and kick decedent into the bathroom and kitchen, as decedent pleaded with defendant to stop. She testified that defendant finally stomped decedent while in the kitchen. This evidence provided a sufficient basis from which the trial court could properly infer that decedent was helpless.

Defendant maintains that the court's refusal to allow the medical examiner to testify about the effects of PCP on humans, and the lack of other evidence to support the conclusion that defendant was defenseless, rendered its determination speculative. We note that, particularly in a bench trial, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from the evidence. (*People v. Westfield* (1990), 207 Ill. App. 3d 772, 566 N.E.2d 392.) The court may accept or reject as much of the testimony as it wishes and draw reasonable inferences therefrom. (*People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112.) It is not required to believe the defendant's testimony.

In examining the record, we find that from the evidence presented the court could reasonably infer that decedent was unable to defend himself because he had consumed narcotics and alcohol. This is true even though there was no expert testimony as to the effects of PCP. Defendant cites to *People v. White* (1989), 183 Ill. App. 3d 838, 539 N.E.2d 456, for the proposition that error occurs where the trial court transgresses the boundaries of the record and bases its findings on its own speculative determinations. In *White*, the trial court made a distinction between the physical characteristics of lacerations caused by a piece of glass as distinguished from those caused by a knife. This determination was made without the testimony of either an expert or other facts in the record to support that conclusion. *White* is distinguishable from this case. Here, the court's conclusion was one that did not require probing into technical and scientific facts, but could properly be inferred based on evidence in the record.

■ Defendant contends that the evidence in the record could have supported second degree murder, and that one of the factors in his testimony was that decedent's attack provoked his counterattack. He asserts that there was evidence in the record of mutual combat, and that decedent's assault of him was prompted by the violent and aggressive behavior resulting from decedent's use of PCP. Defendant argues that by determining that the effects of PCP in the decedent's body rendered decedent helpless, the court destroyed defendant's theory of mutual combat. We find this argument unpersuasive. The testimony of the medical examiner, Provax, and Brueck was sufficient to support the court's inference. We find that the court's determination was not based on speculation nor did it transgress the boundaries of the record. Therefore, we find that defendant was not denied a fair trial.

Defendant next argues that he was denied his constitutional right to confrontation and cross-examination of witnesses against him. Specifically, he maintains that the court's restriction of his questions of the medical examiner regarding the effects of PCP on the human body was an abuse of discretion.

On direct examination the medical examiner discussed the toxicology report prepared in the case, including the amount of PCP and alcohol found in the decedent's body. He opined that in his experience the level of PCP found inside decedent's body was a low level. During cross-examination the medical examiner stated that he knew about PCP and that it is generally used as an animal tranquilizer. He also testified that PCP caused mood changes, euphoria and depression in response to separate questions from defense counsel. Defendant argues, however, that when he asked the medical examiner whether PCP deadened pain, caused flashbacks or ignited aggression, the court improperly sustained the State's objection. Defendant contends that because the medical examiner testified that he had studied what the affects of PCP were, had conferred with a forensic toxicologist about PCP and had read an article on PCP, the court should not have restricted defendant's cross-examination of him on the effects of PCP in humans.

The trial court's discretion to restrict the scope of cross-examination comes into play only after the court has permitted, as a matter of right, sufficient cross-examination to satisfy the constitutional guarantee. (*People v. Edwards* (1991), 218 Ill. App. 3d 184, 541 N.E.2d 144.) To determine the constitutional sufficiency of cross-examination, the reviewing court should not look to what a defendant had been prohibited from doing, but to what he had been allowed to

do. (*People v. Maldonado* (1989), 193 Ill. App. 3d 1062, 1069, **550** N.E.2d 1011.) The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. (*People v. Allison* (1992), 236 Ill. App. 3d 175, 602 N.E.2d 1288.) Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to the reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution case. *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 680, 89 L. Ed. 2d 674, 684, 106 S. Ct. 1431, 1435-36.

■ In this case, defense counsel sought to elicit testimony on cross-examination regarding the medical examiner's professional knowledge. The record reveals that the medical examiner was not qualified to give testimony regarding the effects of PCP after being ingested by humans. Both defense counsel and the prosecution stipulated to the medical examiner's qualifications as a forensic pathologist. He was never qualified to render an expert opinion on the effects of a living person ingesting PCP. During cross-examination, the court admonished defense counsel:

"You have to get another witness [to talk about the effects of living people ingesting drugs.] If you ask him about his background as a forensic pathologist, what he did in this autopsy, this is not a clinical psychiatrist. He is not working in a clinical setting. I think the limits of his expertise are obvious. He himself has indicated them. Let us not waste time with this witness, trying to elicit that testimony."

Although the testimony of the medical examiner here was a significant factor in the prosecution's case, we do not believe that the court's restriction of cross-examination rose to the level of reversible error. (*People v. Blommaert* (1989), 184 Ill. App. 3d 1065, 1075, 541 N.E.2d 147.) The parties stipulated that the medical examiner was qualified as a forensic pathologist, and not as an expert on the effects of PCP. The medical examiner himself advised defense counsel that he was not capable of rendering an opinion regarding the effect of humans ingesting PCP. The evidence in the record indicates that the witness was not competent to answer questions regarding the effects of PCP on human beings. Therefore, **we find**

that the court's restriction of cross-examination was not manifestly prejudicial and did not deny defendant his constitutional rights. *People v. Sanchez* (1989), 131 Ill. 2d 417, 546 N.E.2d 574.

■ Defendant finally argues that the Illinois homicide statute is unconstitutional on due process grounds and separation of powers grounds. This court has recently rejected identical arguments in *People v. Banks* (1992), 227 Ill. App. 3d 462, 592 N.E.2d 107. We likewise find defendant's argument here without merit.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and O'CONNOR, JJ., concur.