SECOND DIVISION

No. 1-09-1585

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| | ) | |
| v. | ) | No. 07 CR 18183 |
| | ) | |
| | ) | |
| CHARLES JACKSON, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham concurred in the judgment and opinion.
Justice Connors dissented, with opinion.

**OPINION**

After a bench trial, defendant, Charles Jackson, was found guilty of first degree murder, but mentally ill. At trial, defendant raised the defense of insanity. On appeal, he asks that this court excuse his procedural default and address whether the trial court abandoned its role as a neutral and impartial arbiter and denied him a fair trial by: (1) assuming the role of prosecutor when questioning defendant's expert witness in regard to defendant's sanity; (2) by interjecting its own personal knowledge of matters outside the record in considering defendant's IQ score and Cook County jail's psychotropic medication distribution practices; and (3) by disregarding evidence of defendant's brain damage and the defense expert's testimony regarding the

antipsychotic medication Risperdal.[1] We hold the trial court abandoned its role as a neutral and impartial arbiter of fact by adopting a prosecutorial role when questioning defendant's expert witness and by relying on matters based on private knowledge of the trial court that were outside the record.

## JURISDICTION

The circuit court sentenced defendant on June 15, 2009. Defendant timely filed his notice of appeal on the day he was sentenced. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, §6; Ill S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

## BACKGROUND

Defendant was charged with first degree murder for the shooting of his son-in-law, Pierre Champliss. The shooting in question occurred sometime between 9 p.m. and 10 p.m. on July 27, 2007, the facts of which are not contested by the parties. The evidence at trial established that defendant lived in the garage of a house owned by his elderly mother, Lillian Jackson. Defendant's daughter, Farrah Jackson, lived with her husband, Pierre Champliss, and their two children in the basement apartment of the house. Lola Connors, a family friend, also rented a room in the house. At the time of the incident, defendant was sitting on the front porch of the house with Connors, Caroline Jackson (defendant's sister), Regina Lee (defendant's niece), and

---

[1] Defendant also raised the issue of ineffective assistance of counsel, but due to the disposition of this appeal, we need not address it.

No. 1-09-1585

Larry Edwards (defendant's brother-in-law). They were waiting for the ambulance that was transporting Lillian home from the hospital. Champliss was in front of the house waiting for his wife Farrah to come home. Connors testified that Champliss was walking up and down the sidewalk in the front of the house verbally abusing defendant and talking about what he was going to do to defendant and Caroline. At that time, the ambulance arrived, but was waiting in the driveway for a second ambulance to arrive so the paramedics could assist in carrying Lillian into the house.

Champliss approached defendant with his right fist in his left hand, striking it repeatedly. Connors testified that Champliss had threatened to kill defendant on "many occasions." Defendant and Champliss were arguing over who was going to take Lillian Jackson's possessions once she passed away. Champliss was very close to defendant's face and told defendant "that's what I thought and walked away." Defendant then went to the back of the house. Shortly after, defendant returned to the front of the house with a shotgun in his hand. Defendant then fired a shot at Champliss, who was standing at the front gate of the house. Champliss then ran across the street and fell. Defendant followed Champliss and shot him again. As Champliss was on the ground, defendant stated, "you can't talk now, can you?" Defendant shot Champliss again. Defendant also fired shots into Champliss's body as he stood over him.

Defendant then walked back across the street toward the house with the shotgun in his hand. He stated, "where is my daughter? I kill her too." By then, Farrah, defendant's daughter had arrived home. She was standing by her car as defendant approached and threatened her. At this point, defendant was in the middle of the street, trying to load the gun, but the gun was

3

jammed. Farrah was walking toward her basement apartment. When Farrah reached her apartment, her daughter told her that Champliss was outside. She then ran out the door and the police were outside. Farrah did not see defendant again until trial. Connors and Caroline Jackson did not see defendant return to the house after the shooting. Defendant then went to the liquor store, bought alcohol, and then went to the park across the street and watched the investigation.

On August 5, 2007, Officer Roberto Sena responded to an assignment over dispatch for a person wanted for murder. In responding to the assignment, he saw defendant riding his bicycle. Officer Sena spoke with Champliss's family and friends, who were in a car following defendant. Champliss's family and friends informed Officer Sena of defendant's name. When Officer Sena asked defendant his name, defendant told him a different name. Officer Sena then viewed a picture of defendant in the computer system to confirm that he was speaking with defendant. As Officer Sena approached him, defendant asked for a lawyer. Officer Sena informed defendant of his *Miranda* rights and then placed him under arrest.

Following defendant's arrest, he was taken to Cermak Health Services. At Cermak, defendant began receiving the medications Risperdal and doxepin. He was also later prescribed Zoloft. Defendant then went from Cermak to the residential treatment unit at the Cook County jail, where he remained until his conviction.

The autopsy on Champliss's body revealed that he had a shotgun wound to the right upper chest, two shotgun wounds in the left chest area, and two shotgun wounds over the left, lower abdomen.

At his bench trial, defendant raised the defense of insanity. Defendant presented the

4

expert testimony of Dr. Bruce Frumkin, an expert in forensic psychology, who testified that

defendant was not sane at the time of the offense. Dr. Frumkin opined that defendant's insanity

was the result of the mental defect of persisting dementia due to substance abuse and the mental

illness of psychotic disorder, not otherwise specified. The trial court interjected during Dr.

Frumkin's testimony numerous times. The following paragraphs contain the interjections of note

from the record made by the trial court during the direct examination of Dr. Frumkin.

Dr. Frumkin testified that he relied on an interview with defendant, psychological tests,

interviews with family members, records, and police reports in formulating his opinion. On direct

examination, defense counsel asked him about the importance of reviewing defendant's health

records from Cermak Health Services, and the following colloquy took place:

"A. Well, one is that these are mental health professionals

who saw [defendant] soon after the alleged offense. So, you know,

evaluating insanity is retrospective analysis going back in time - -

THE COURT: [Interrupting] When there are psychological

records proceeding the date of offense, it wouldn't be

retrospective?

THE WITNESS: No. But it is important to look at that as

well.

THE COURT: Was there any in this case?

THE WITNESS: No ***."

Defense counsel then asked Dr. Frumkin whether he asked any other people to perform

No. 1-09-1585

testing on defendant. The trial court interjected a question regarding a test that Dr. Frumkin had not requested to be performed on defendant.

"A. After I had done my evaluation of [defendant], I had a strong suspicion that there may be some neuropsychological issues with the Defendant. So, I called upon Dr. Robert Heilbronner to do a neuropsychological examination. Dr. Heilbronner, in addition to doing an interview with [defendant], did a number of neuropsychological tests.

THE COURT: As well as neurological tests?

THE WITNESS: Neuropsychological.

THE COURT: I know. Did you also make a referral to do a neurological?

THE WITNESS: No."

The trial court next asked Dr. Frumkin for confirmation that defendant had attended college and from what school.

"THE COURT: Did you confirm attendance and degree status there?

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: But I mean it was confirmed in speaking to family members. They talked of him having gone to college.

6

No. 1-09-1585

THE COURT: Gone or become degreed?"

Dr. Frumkin testified that defendant notified him that he had injuries from boxing, a motor vehicle accident, and chronic substance abuse, and that he was exposed to paint and solvents without protective masks. The trial court stated;

"THE COURT: This is all self-reported. In other words,

I'm looking for any exterior, outside corroboration ***.

THE WITNESS: Sure. That's all self-reported. ***.

***

THE COURT: Did you get any military records about it?

THE WITNESS: No."

The trial court asked Dr. Frumkin whether defendant was on any medication at the time of his examination. When Dr. Frumkin answered by describing the medicine defendant had been on, the trial court again interjected, questioning Dr. Frumkin's area of expertise.

"THE COURT: Is he on any other medication at the time

of your or Dr. Heilbronner's examination?

THE WITNESS: Yes.

THE COURT: What are those?

THE WITNESS: He was on Risperdal, ***.

***

THE COURT: You are not a physician though, are you?

THE WITNESS: I'm not a physician, but what were you

7

going to ask?

THE COURT: One of them is a heroin derivative, isn't it?

Doxepin? They are both scheduled narcotics?

THE WITNESS: Yes.

THE COURT: But that's outside of his area of expertise.

***

THE COURT: Doctor, I have to pause here. I don't

believe that is an area of expertise for you. He's not a physician.

He can't give drugs. He doesn't know even what is contained

within the drug. This isn't anything he can prescribe. And unless

he can identify how a psychologist can testify about the effects of

medicine, because they can't prescribe them, I'm going to exclude

that testimony."

Dr. Frumkin testified that an unidentified individual at Cermak, who had seen defendant

soon after he was taken into custody, diagnosed defendant as having psychotic disorder, not

otherwise specified. The following exchange then took place after the trial court asked Dr.

Frumkin if he had looked at the Cermak records:

"THE WITNESS: A psychology intern diagnosed

[defendant] as having rule out schizophrenia, paranoid type and

also psychotic disorder not otherwise specified. Which was not a

rule out.

No. 1-09-1585

THE COURT: What is that intern's name?

THE WITNESS: [witness could not read intern's name]

***

THE COURT: You said there *** were several opinions in line with what you made. So far you identified one, which was not an opinion, but possibly the case. But if you have an opinion in there that you relied on from another psychiatrist or psychologist that you say is in line with that, that's something I want to know.

THE WITNESS: I mean all the records from Cermak are all uniformly describing him as someone who is very delusional.

THE COURT: The question is: Is there an opinion in there from anyone that says he's suffering from the same mental disease or defect that you are asserting he's suffering from, or even at the time of admission to Cermak?

THE WITNESS: Most common diagnosis is psychotic disorder not otherwise specified.

THE COURT: You indicated one as a rule out. Thats not a diagnosis. I know you know that. My question is: Is there a diagnosis consistent with what we both know to be a diagnosis, consistent with yourself. I really want to know that. If there is, tell me and identify the Doctor's name. I know the writing is bad on

9

that one intern report?

THE WITNESS: Let me look.

THE COURT: I think that is important. I want to know his mental status at [the] time he's there. I'd like to know that.

\*\*\*

THE COURT: I want you to go through that first and see if you can find that for me. If that record there indicates there was a prior diagnosis from a psychiatrist or psychologist?

THE WITNESS: Right, okay. But he is being prescribed antipsychotic medication.

THE COURT: I mean you have done work at other institutions. I'm told that's given in circumstances where somebody would not meet the DSM III requirement for mental illness. They are given proactively for people in incarcerated circumstances. That's why it is important for me. I want to know, you know, there was a diagnosis here.

THE WITNESS: Okay.

THE COURT: I am going to consider the fact he was on drugs, obviously I want to know if the issuance of the drugs is predicated on a diagnosis from a Doctor, either psychological or psychiatric. Take as much time as you'd like.

10

***

THE WITNESS: Okay. [thereby the witness has difficulty reading the name of the evaluator on the Cermak initial psychiatric form]***

THE COURT: ***. Is there some indication that person is a professional?

THE WITNESS: Well, they call it a psychiatric assessment.

THE COURT: You are going to make that conclusion that the person went to school for eight years and got a full internship and practiced in the field? You are going to make that assessment strictly predicated on that? I'm asking you? You said Doctor so and so.

THE WITNESS: I didn't say Doctor so and so. I don't know. I don't know, Judge.

***

THE WITNESS: Okay, on - - This looks like a med student. I don't know how much weight I am putting on it.

THE COURT: You say it seems?

THE WITNESS: It says med student there. It appears these are med student notes. They are diagnosing him as a psychosis, depression. ***

11

***

THE WITNESS: I don't want to be misleading myself though, your Honor. I'm relying not as much on the diagnosis they give, per se. Because I don't know whether the diagnosis is- -

THE COURT: [Interrupting] Here's why I ask you. Let me explain to you. So you understand my thinking. If there was somebody identifiable there, and I understand, that person said yes, I am a clinical psychologist or psychiatrist or forensic psychologist. Or clinical psychiatrist. It is my view that this person has X mental disease or defect. And that was an opinion rendered closer in time to the one in which you engaged, that would have been relevant to me. When you said that you had your opinion in line with these prior opinions, I was looking for that. Because that would have, in my view, been corroborative evidence as it relates to the testimony you are going to offer. There is certainly corroboration there, the evaluation you conducted?

THE WITNESS: But in terms of the way I'm viewing this, I'm less interested in the diagnosis a professional gives, because they may be right or wrong, or they may not know what they are doing. But more of the behavior that they describe. Then I'm available to look at the behavior.

12

THE COURT: You said it was in line. That's not really the case maybe. I don't know. It remains to be seen. He certainly evidenced symptoms. I understand that."

Defense counsel asked Dr. Frumkin if he diagnosed defendant with a mental disease, to which Dr. Frumkin answered that he did.

"A. It was apparent to me [defendant] had psychotic disorder. And psychotic disorder not otherwise specified is sort of a catchall category. If one set of symptoms don't fit neatly into other categories of psychosis, and though I could give him something like paranoid personality disorder, delusional disorder or something like that, the reason I didn't is because he also had the hallucinations that he reported. So, psychotic disorder not otherwise specified, realizing that with the brain damage he also has - -

THE COURT: [Interrupting] Wait a second. Wait. Do you have any medical corroboration of brain damage, other than the testing you say points to that? You said brain damage. What is brain damage? You have not talked about that before.

THE WITNESS: Dr. Heilbronner talked about there being damage.

THE COURT: Did he do a CT scan? Was there any

13

evidence of any organic brain injury? Other than the anecdotal information provided by the family?"

Dr. Frumkin testified that his diagnosis was based upon criteria listed in the "DSM IV PR." Defense counsel asked Dr. Frumkin to explain what the "DSM IV" is. Before the witness answered, the court stated, "I know what it is. Next question." The prosecuting attorney did not make any objections during the direct examination of Dr. Frumkin.

The trial court also made numerous interjections during the State's cross-examination of Dr. Frumkin. The following paragraphs show the interjections made by the trial court of note during the cross-examination. First, the prosecuting attorney pursued a line of questioning in regards to defendant's flight from the scene. Dr. Frumkin testified that he believed defendant did not appreciate the wrongfulness of his actions. The following colloquy took place among the prosecutor, Dr. Frumkin, and the trial court:

"A. Well, he said he fled the scene because he was fearful of the other gang members that [the victim] was associated with.

Q. That's what he told you?

THE COURT: That seems kind of cogent, Doctor, doesn't it? Did you find that to be delusional in any way?

THE WITNESS: Well, he said he was fearful. He may have reason to be fearful and maybe not. He said he was fearful of [the victim].

THE COURT: He was able to understand and fear other

14

gang members, but unable to understand the criminality of his conduct?

THE WITNESS: No, he said he was fearful of [the victim]. He said he shot him- -

THE COURT: [Interrupting] I mean you reviewed the facts of the case. There was a verbal altercation ongoing between them?

THE WITNESS: Yes.

THE COURT: That precipitated the murder. The killing. Whether or not it is a murder is yet to be determined.

THE WITNESS: Yes.

THE COURT: So, wouldn't the fact that he is continuing to move out, in fear of other individuals there to defend [the victim] once the death occurred to be evidence of reasonable thought?

THE WITNESS: I don't think - -

THE COURT: [Interrupting] Obviously, if he stayed there, with the victim, I mean that would be something I would [] consider as evidence he wasn't cognizant of it?

THE WITNESS: But that's assuming he wasn't afraid of [the victim]. He's saying he was afraid of [the victim] and people he associated with. One uses that as a basis of being afraid of [the victim] and the other people he associated with. Why would he

15

stay on the scene after shooting [the victim]. Because he would still be fearful.

THE COURT: Wouldn't his fear be predicated on the murdering of [the victim], if that's what he thought? In other words - -

THE WITNESS: He knows he killed [the victim]

THE COURT: He did tell you he's aware he killed [the victim] out on the street?

THE WITNESS: Yes, for example, in Florida, the insanity defense - -

THE COURT: [Interrupting] I don't really want to go into that.

THE WITNESS: I'm not saying that he didn't know what he did. He knew he shot and killed someone. He knew that. He wasn't able to appreciate the wrongfulness of the action.

THE COURT: He was able to appreciate that others would view [what] he had done wrongfully and they would seek to get him for what he had done. I guess that's what I'm saying. You run away from the confederates of the person you killed, you are able to appreciate that they would take umbrage with the wrongfulness of your conduct. You see what I'm saying?

16

THE WITNESS: Even if he had not killed [the victim], he still might have run away. He was fearful of these people.

THE COURT: I'm not asking you what he may have done. He did tell you, you said it already, he was fearful of [the victim's] confederates, fellow gang members.

THE WITNESS: Yes.

THE COURT: Wouldn't that fearfulness, the reaction of his confederates, the people with whom he associated, the victim, wouldn't that be evidence you would consider as it relates to his understanding of the wrongfulness of his conduct?

THE WITNESS: I look at it more in terms of the self defense perspective of it. I mean that would be evidence of self defense motive behind what he's accused of doing.

THE COURT: Well, he did give you that. He gave you a defense.

THE WITNESS: Yes. That's consistent with that. *** Now, I don't know whether I want to get into technicalities, if in Illinois law the term was did he know the wrongfulness versus appreciate the wrongfulness, I don't know whether I would have had the same conclusion or not. I'd have to think about that. In terms of appreciating the wrongfulness, I don't think he was able

17

to appreciate and - -

THE COURT: [Interrupting] Well, Illinois law, so you are clear, says the Defendant lacks substantial capacity to appreciate the criminality of his conduct.

THE WITNESS: Criminality, okay.

THE COURT: You just said that you think it was to know?

THE WITNESS: No. I know it is not to know. I know in Illinois it is not to know. *** He's not able to rationally make the decision, I believe in terms of that.

THE COURT: But that's not rational decision making, is it? They are not saying whether or not he appreciated the criminality of his conduct.

THE WITNESS: I don't believe he's able to appreciate the criminality of his conduct."

The prosecutor asked Dr. Frumkin if he attempted to speak with Farrah Champliss, wife of the victim, about defendant, Farrah's father. Dr. Frumkin responded that one of the people he had spoke with was defendant's previous attorney, Mr. Stahl. The trial court interjected and questioned Dr. Frumkin regarding who he received compensation from.

"THE COURT: That leaves me the question, were you engaged by Mr. Stahl?

THE WITNESS: Yes. At the time of this evaluation, I was

18

engaged by Mr. Stahl.

THE COURT: You are remunerated by the Public

Defender's Office?

THE WITNESS: Yes. Not for the testimony. But for

anything prior.

THE COURT: That's the question.

WITNESS: Yes."

The prosecutor also asked Dr. Frumkin whether he was the first doctor consulted in the

case or whether defendant first went to Forensic Clinical Services. It appears from the record that

the court sustained a nonexistent objection during the following exchange.

"A. I believe I was involved first. ***.

Q. I think you are correct. I mean I would like to know

what you think about whether - -

THE COURT: I'll sustain that objection anyway. I don't

know that matters."

The trial court again interjected during cross-examination, without an objection, asking for

the relevance of an eyewitness to the crime in the following exchange among the prosecutor,

Dr.Frumkin, and the trial court.

"Q. Okay. One point did [Carolyn Jackson] tell you she

was not an eyewitness to the murder, that she in fact was inside the

house and did not see anything?

19

No. 1-09-1585

A. Can I look at my notes?

THE COURT: I am going to ask the relevance.

Ms. O'Connor: Judge, the relevance is that the family

members he consulted with are biased.

THE COURT: Then ask questions that relate to the bias.

You know."

The trial court interjected into Dr. Frumkin's testimony that defendant's neighbors had

threatened him.

"A. *** [O]ne of [the neighbors] was responsible for maybe

the death of the dog. But certainly not all three groups of

neighbors, who didn't know each other, were all responsible for the

death of the dog. Again, on - -

THE COURT: [Interrupting] Did he tell you they didn't

know each other?

THE WITNESS: My understanding is they didn't.

THE COURT: That's not my question. Did he say to you,

three sets of neighbors who didn't know each other? Did he say

that?

THE WITNESS: No, no."

The prosecutor then asked Dr. Frumkin whether the defendant was the only person who

had told him that the neighbors had threatened defendant in the past. The trial court interjected,

20

asking Dr. Frumkin:

"THE COURT: Did [defendant] tell you what the fight was about that day?

THE WITNESS: Yes. He went into great detail. You mean with [the victim]?

THE COURT: What did he tell you about that?

THE WITNESS: He goes into detail. They had been having this ongoing feud. Can I look at my notes?

THE COURT: Yes. I was asking you to refresh your recollection as to what he told you about why they had that altercation.

WITNESS: [Dr. Frumkin answers, discussing the feud between defendant and the victim].

\*\*\*

THE COURT: So, there was some evidence of impulse control in that, wouldn't you agree, by not immediately reacting?

THE WITNESS: Yes, I agree."

The prosecutor asked Dr. Frumkin whether he considered the fact that defendant asked for an attorney upon his arrest as a factor in deciding whether defendant appreciated the criminality of his actions. The court interjected.

"A. It is a factor I considered.

21

THE COURT: You have been impugning [defendant's] intellect. I would think that would be pretty fair evidence of the understanding of a rather nebulous right provided to him by the Constitution of the United States, the State of Illinois."

The prosecutor pursued a line of questioning culminating in asking Dr. Frumkin whether defendant's previous injuries, including a football injury, would cause brain damage. The court interjected.

"Q. Would that cause brain damage?

THE COURT: That's outside his scope?

THE WITNESS: It is not. I can answer that. I don't think it is. Because, again, I deal with these sorts of issues all the time. It could. It may not. It depends on the type of injury.

MS. O'Conner [Assistant State's Attorney]: Okay.

THE COURT: That's the answer?

THE WITNESS: That's my answer.

THE COURT: Depends on the type of injury. It depends on the type of injury. We don't know. You don't know. It is self reported.

THE WITNESS: Sure.

THE COURT: You didn't do any of the sort of testing that would result in a conclusion that was based on organic injury. Is

that correct?

THE WITNESS:  No testing was done at the time of the football injuries to be able to know that.

THE COURT:  or other than the neuropsychological information provided by your co-doctor on this, any sort of diagnostic procedure that was done to the Defendant other than testing?

THE WITNESS:  He was not given any neuropsychological evaluations or CT scan or PT scan or anything like that."

The prosecutor asked Dr. Frumkin whether a CT scan would have provided corroboration of his diagnosis of a brain injury.  In response, Dr. Frumkin testified that a CT scan may have provided corroboration, but that the significant difference between defendant's verbal and performance IQ scores was significant in his analysis.  As Dr. Frumkin was completing his answer, the court interjected.

"A. *** You know, if we had known he was in special education classes - -

THE COURT: [Interrupting] Do you have any records other than the fact he had an Associate's, any prior IQ tests?

THE WITNESS:  Not as far as I know."

The prosecutor asked Dr. Frumkin whether he had considered the victim's actions in attempting to secure defendant's mother's inheritance for his wife as a factor in defendant's

No. 1-09-1585

motivation for shooting the victim.  The court interjected.

"A.  I considered it as a possible factor in the motivation *** .  But I believe because of the brain damage and mental disease he wasn't able to appreciate criminality of the conduct.

THE COURT:  His insanity didn't preclude his appreciation of motive for the killing, did it.  You are saying it is more of an issue of impulse control?

THE WITNESS:  No, no.  Not impulse control at all.  It is ability, you know, if you are not looking at the world in a reality oriented fashion, it is har[d] to make wise choices when you feel threatened, whether you have reason to feel threatened or not.

THE COURT:  If I'm going to accept your opinion, whether or not I do, I don't know yet, but if I'm going to accept your opinions I need to understand them fully.  The reason I asked these questions, because you have indicated that he provided you with information about what antagonized him.  You indicated that he provided you with information about him being antagonized for a period of time prior to actually acting.  Including physical combat prior to the point where he actually retrieved the gun and shot?

THE WITNESS:  Yes.

THE COURT:  You indicate that following the incident he

24

ran from the scene and that running was predicated on his understanding that someone might solicit revenge upon him for his conduct?

THE WITNESS: Correct.

THE COURT: Those other someones [*sic*] were people, associates of the people he had shot based on what he told you?

THE WITNESS: Yes. I guess - -

THE COURT: [Interrupting] So, where within there is the misapprehension about the wrongfulness of his conduct?

THE WITNESS: Because there is this psychotic overlay and brain damage overlay where he was not able to come up with alternate choices of what to do in that situation.

THE COURT: Let's say I accept the mental disease and defects. Let's say I accept that. How with these sets of circumstances, and his conduct, could I determine, according to the statue, that that mental disease or defect, that he lacked substantial capacity to appreciate the criminality of his conduct?

THE WITNESS: Because he would not have had the resources to ever appreciate him doing other sorts of things to get out of that situation. Be it a rational - -

THE COURT: [Interrupting] Well, that would almost apply

to every person that ever killed anyone.

THE WITNESS: Well, except - -

THE COURT: [Interrupting] There is always the murder would occur in a circumstance under which other actions could have resulted in it occurring?

THE WITNESS: I guess the difference in this case is here someone - -

THE COURT: [Interrupting] You overlay the disease and defect, is that what you are saying?

THE WITNESS: Yes, Yes."

The final interjection of note made by the trial court during cross-examination was when the prosecutor asked Dr. Frumkin about defendant's substance abuse, in which he responded that defendant used LSD in the Army. The court interjected, asking:

"THE COURT: Did he tell you whether or not he ever saw active duty? Not active duty, but combat?

THE WITNESS: He said he worked as a teletypist. He was afraid to go into more detail because it was top secret."

The State presented the expert testimony of Dr. Sharon Coleman, an expert in forensic psychology, and Dr. Nishad Nadkarni, an expert in forensic psychiatry. Both Dr. Coleman and Dr. Nadkarni testified that defendant was sane at the time of the offense. Dr. Coleman stated that she believed that defendant suffered from cocaine and alcohol dependence, depressive disorder,

26

and paranoid personality disorder. Dr. Coleman opined "that the defendant was not suffering from a mental disease or defect such that he lacks substantial capacity to appreciate the criminality of his conduct." Dr. Nadkarni made the same determination as to whether defendant appreciated the criminality of his conduct and opined that defendant manifests a history of substance dependence and suffers from substance abuse mood disorder. Dr. Nadkarni explained that defendant's symptoms "were directly related to intoxication."

The court found defendant guilty, but mentally ill. The trial court explained some of the facts it found compelling in finding as it did; specially, that defendant reacted "understandably" to Champliss's antagonism towards him, that defendant's comments after shooting Champliss showed retribution, that defendant fled the scene immediately after the crime, the weapon was never found, defendant was gone from the area for a week, and when confronted by the police, defendant gave a false name and, once arrested, he immediately asked for an attorney. The trial court noted, the "IQ I considered to be a total canard. I don't see the relevance of IQ in this case," and that "[m]ental acuity is constantly misrepresented in the circumstances of the testimony that I hear from the witness stand in this building." The trial court attributed the divergence between defendant's verbal IQ and performance IQ score "as being more predicated on factors relating to how individuals react to written tests versus how individuals react to verbal tests." The trial court also noted that it found Dr. Coleman's expert testimony to be "one of the more fact driven opinions in the case."

## ANALYSIS

Defendant argues that he was denied due process because the trial court abandoned its

role as a neutral and impartial arbiter of facts. Defendant contends the trial court's interjections during the testimony of Dr. Frumkin established in the State's favor that defendant's act of shooting Champliss was reasonable given Champliss's previous antagonism toward defendant, that defendant's flight from the scene was reasonable because of defendant's fear of retaliation due to his fear of Champliss's associates, and that defendant exhibited impulse control in not retaliating against Champliss in the past. Defendant also argues that the interjections by the trial court and the trial court's eventual findings demonstrate that the trial court relied on matters outside the record and disregarded evidence in reaching its conclusion.

Defendant admits that he did not object at trial or in a posttrial motion to the trial court's comments, but asks this court to excuse his procedural default and address the merits of the issues. See *People v. Enoch,* 122 Ill. 2d 176, 186 (1988) (both an objection at trial and an objection in a posttrial motion are required to properly preserve an issue for appeal). The plain error doctrine allows this court to review a forfeited claim of error that affects a substantial right in two instances: "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron,* 215 Ill. 2d 167, 178-79 (2005); see also Ill. S. Ct. R. 615(a) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). Under either prong, the defendant bears the burden of persuasion. *Herron,* 215 Ill. 2d at 187. Under the second prong of a plain error analysis, prejudice is presumed, but "the defendant must prove

there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron,* 215 Ill. 2d at 187.

Where the trial court abandoned its role as a neutral and impartial arbiter of fact, we will review defendant's claim under the second prong of the plain error doctrine because the trial court's conduct pertained to defendant's right to a fair trial. *Village of Kildeer v. Munyer,* 384 Ill. App. 3d 251, 257 (2008) ("when a judge displays signs of bias against the defendant, the system ceases to function as it properly should, resulting in plain error and requiring reversal" (citing *People v. Phuong,* 287 Ill. App. 3d 988, 993 (1997))).

Under the Criminal Code of 1961, a defendant is insane and, thus, "not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect," if "he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2006). A defendant raising the defense of not guilty by reason of insanity has the burden of proving insanity by clear and convincing evidence. 720 ILCS 5/6-2(e) (West 2006).

A criminal defendant who elects to be tried in a bench trial "is entitled to the same fair, patient, and impartial consideration he would be entitled to by a jury composed of fair, impartial, careful and considerate jurors." *People v. Trefonas*, 9 Ill. 2d 92, 100 (1956). The trial court has "the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure." *People v. Palmer,* 27 Ill. 2d 311, 314 (1963). A trial judge's questioning of a witness must be done "in a fair and impartial manner, without showing bias or prejudice against either party." *People v. Marino,* 414 Ill. 445, 450 (1953). A trial judge's questioning "should rarely be extensive," although an "extensive examination may be justified if

29

the court has reason to believe that a witness is not telling the truth." *People v. Wesley*, 18 Ill. 2d 138, 155 (1959).

Whether a trial court's questioning of a witness is appropriate depends on the facts and circumstances of each case, and rests largely in the discretion of the trial court. *Palmer,* 27 Ill. 2d at 315. A trial court abuses its discretion when it adopts the role of advocate for one of the parties. *People v. Murray,* 194 Ill. App. 3d 653, 658 (1990). In a bench trial, the danger of prejudice due to the trial judge's questions to a witness is lessened. *Palmer,* 27 Ill. 2d at 315; *People v. Smith,* 299 Ill. App. 3d 1056, 1062 (1998). To show prejudice in a bench trial, the defendant must show that "the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence." *People v. Smith,* 299 Ill. App. 3d 1056, 1063 (1998).

In a bench trial, the judge is limited to the record developed during the course of the trial before him. *People v. Wallenberg,* 24 Ill. 2d 350, 354 (1962). A trial judge is "free to accept or reject as much or as little as [he] pleases of a witness' testimony." *People v. Nelson,* 246 Ill. App. 3d 824, 830 (1993). "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." *Wallenberg*, 24 Ill. 2d at 354. A trial judge sitting as trier of fact is presumed to have considered only admissible evidence in making his decision. *Id.* This presumption can be rebutted through affirmative evidence in the record. *People v. Kent,* 111 Ill. App. 3d 733, 740 (1982).

In this case, the trial court abandoned its role as a neutral and impartial arbiter of fact by

adopting a prosecutorial role when questioning defendant's expert witness and by relying on matters based on prior private knowledge. We hold that the trial court's conduct constitutes an abuse of its discretion. *Murray,* 194 Ill. App. 3d at 658 (trial court abuses its discretion when it adopts the role of advocate for one of the parties). The trial court's abuse of its discretion was plain error and rendered defendant's trial fundamentally unfair. *Herron,* 215 Ill. 2d at 187 ("the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process"). Therefore, defendant has satisfied his burden under the second prong of the plain error doctrine.

First, the tone and manner of the questions asked by the trial court to Dr. Frumkin exhibit bias that is more similar to a cross-examining prosecutor than an impartial jurist. We note that the trial court did not exhibit the same tone and manner during the testimony of the State's expert witnesses. The trial court's questioning was argumentative and showed a disregard and unfavorable bias toward Dr. Frumkin's testimony. For example, Dr. Frumkin relied upon defendant's reports of his past injuries and substance abuse, which the trial court stated was "all self-reported. I'm looking for any exterior, outside corroboration of the information." The trial court questioned Dr. Frumkin's knowledge of various drugs and his area of expertise, even though the trial court initiated Dr. Frumkin's testimony by asking what medication defendant had been on at the time of the examination. The trial court also questioned Dr. Frumkin on Cermak's records, which Dr. Frumkin had difficulty reading. Dr. Frumkin testified that he relied on the Cermak records because they were close in time to the incident and described defendant's behavior, but the trial court's questioning showed disregard for this answer. Instead the trial

31

court questioned whether the diagnosis from Cermak was proper, even though Dr. Frumkin had no way of knowing who prepared the reports at Cermak.

The trial court's questions of Dr. Frumkin were a cross-examination of defendant's defense of insanity. It was extensive and not done in a fair, impartial manner. The trial court questioned Dr. Frumkin regarding whether there were any clinical psychological records from before the incident even though Dr. Frumkin was relying on the record of mental health professionals who saw defendant soon after the alleged offense. The trial court asked Dr. Frumkin if his referral to Dr. Heilbronner included requests for neurological tests even though Dr. Frumkin testified that Dr. Heilbronner conducted neuropsychological tests. The trial court questioned Dr. Frumkin whether he confirmed defendant's college enrollment and whether he knew if defendant had obtained a degree. The trial court also sought confirmation that defendant was actually in the military and whether defendant saw active duty. The trial court also asked Dr. Frumkin who had hired him and who was paying him, exposing Dr. Frumkin's potential bias. The trial court asked for corroboration of defendant's brain damage, even though Dr. Frumkin testified he was relying on the diagnosis of another doctor. The tone of and resulting answers to these questions suggest that the trial court prejudged the outcome of the case.

The trial court also constantly interrupted Dr. Frumkin, contradicting or questioning many of his answers. Most of the trial court's questions came during direct examination, thus hindering defendant from presenting his case. The prosecutor did not make any objections and, thus, the unfavorable testimony was elicited solely through the trial court's questioning. Favorable testimony by Dr. Frumkin was halted by the trial court's questioning. Even during cross-

examination, the trial court's questions appeared to aid the prosecution's case. For example, when the prosecuting attorney pursued a line of questioning concerning defendant's flight from the scene, the trial court interrupted stating that defendant's fleeing from the scene seemed "kind of cogent," which started a series of questions between the court and Dr. Frumkin that lasted several pages in the transcript. During this series of questions, the trial court repeatedly referred to the shooting as "murder" even though the trial had not ended, which is more evidence that the trial court prejudged the case before hearing all of the evidence. It appeared as though the court had taken over the cross-examination of Dr. Frumkin. During cross-examination the trial court even sustained two of its own objections. After one of the objections, the trial court then directed the prosecutor to "ask questions that relate to bias. You know."

As the dissent rightly observes " 'the trial judge has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure,' and the extent and manner of such questioning is left to the discretion of the trial court, especially in the context of a bench trial." Slip op. at 36, citing *Palmer*, 27 Ill. 2d at 314-14. However, our review of the entire record, with due regard to keeping all matters within their proper context, reveals numerous examples of conduct that show the trial court assumed the role of a prosecutor as well as exhibited bias throughout the trial. *Marino,* 414 Ill. at 450 (a trial judge's questioning of a witness must be done "in a fair and impartial manner, without showing bias or prejudice against either party"). The manner in which the trial court questioned defendant's expert witness indicates the court prejudged the outcome of the case before hearing all of the evidence. *Smith,* 299 Ill. App. 3d at 1063 (to show prejudice in a bench trial, the defendant must show that the

33

"tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence"). The majority of the trial court's questions to Dr. Frumkin were not to "elicit truth" or "to bring enlightenment on material issues which seem obscure," but rather were argumentative and hostile.

Our review of the record also shows the trial court relied on matters outside the record in reaching its conclusion. When questioning Dr. Frumkin concerning the medications defendant received at Cermak, the trial court stated "they are given proactively for people in incarcerated circumstances." However, Dr. Frumkin, the first expert witness to testify, had offered no evidence to support the court's statement. On direct examination, defense counsel sought to elicit testimony from Dr. Frumkin explaining what "DSM IV" is, but the trial court interrupted stating, " I know what it is. Next Question." The trial court also stated evidence not found in the record when discussing its conclusions concerning the IQ evidence, stating, the "IQ I considered to be a total canard. I don't see the relevance of IQ in this case," and "[m]ental acuity is constantly misrepresented in the circumstances of the testimony that I hear from the witness stand in this building." Dr. Frumkin had testified extensively that the significant difference between defendant's verbal and performance IQ scores was significant in his analysis. The trial court's personal feelings toward IQ testing being "a total canard" and the relevance of IQ testing show the trial court relied upon its own private knowledge, untested by cross-examination. *Wallenberg*, 24 Ill. 2d at 354. ("A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law.").

34

No. 1-09-1585

Defendant asks that this court remand the case for a new trial before a different judge. We agree and remand the matter for a new trial in front of a different judge. See *People v. Dameron,* 196 Ill. 2d 156, 179 (2001) (after holding that the trial judge's actions were improper, the cause was ordered to be heard before a different judge on remand "in order to remove any suggestion of unfairness"); *People v. Rowjee,* 308 Ill. App. 3d 179, 187-88 (1999) ("given that this case is being reversed based on the trial judge's private investigation, on remand it should be tried before a different judge").

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded to the Presiding Judge of the Circuit Court of Cook County, Criminal Division for reassignment before a different judge and a new trial.

Reversed and remanded with directions.

No. 1-09-1585

JUSTICE CONNORS, dissenting:

I respectfully dissent. In my opinion, the trial court's questioning of Dr. Frumkin was not an abuse of discretion. As explained below, it is my opinion that, rather than prejudging the evidence before it was heard, the trial court in this case fully discharged its duties as finder of fact and thoroughly weighed all of the evidence presented by both sides before coming to a decision.

The parties agree that this issue is forfeit and can only be reached under the plain error doctrine. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Further, I agree that this issue falls under the second prong of the plain-error doctrine because it implicates the fundamental fairness of defendant's trial. See *Village v. Kildeer v. Munyer*, 384 Ill. App. 3d 251, 257 (2008). This means that the central plain-error question in this case is whether the trial court erred, given that if we find that there was error then it is reversible error under the second prong without further analysis. Defendant has the burden of persuasion on the issue of error. See *Enoch*, 122 Ill. 2d at 186.

The supreme court has stated that the "trial judge has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure," and the extent and manner of such questioning is left to the discretion of the trial court, especially in the context of a bench trial. *People v. Palmer*, 27 Ill. 2d 311, 314-15 (1963). The trial court has significantly greater latitude to question witnesses on material issues during a bench trial because the danger of prejudice to the defendant is lessened. See *id.* However, such questioning must be fair and impartial. See *People v. Nevitt*, 135 Ill. 2d 423, 456 (1990). The propriety of specific

36

questioning depends on the facts and circumstances of each case. See *Palmer*, 27 Ill. 2d at 315; accord *Nevitt*, 135 Ill. 2d at 456.

A trial court abuses its discretion in questioning a witness when it "depart[s] from [its] proper function as [a] judge and assume[s] the role of an advocate." *People v. Green*, 17 Ill. 2d 35, 40 (1959). Because improper questioning from a trial judge implicates the fairness of a defendant's trial, the "relevant inquiry in a non-jury trial is whether the tenor of the court's questioning indicates that the court has prejudged the verdict before hearing all of the evidence." *People v. Griffin*, 194 Ill. App. 3d 286, 296 (1990) (citing *United States v. Kidding*, 560 F.2d 1303, 1314 (7th Cir. 1977), *cert. denied sub nom. Brown v. United States*, 434 U.S. 872 (1977)).

The fact that defendant intentionally killed Pierre Champless was undisputed at trial, and the sole issue in contention was defendant's affirmative defense of insanity. To obtain an acquittal based on this defense, defendant has the burden of proving two elements by clear and convincing evidence: (1) that he suffered from a mental disease or defect at the time of the crime, and (2) that, as a result of that defect, he lacked substantial capacity to appreciate the criminality of his actions. See 720 ILCS 5/6-2(a) (West 2006). When a defendant proves that he suffered from a mental disease or defect at the time of the crime but fails to prove that he lacked substantial capacity to appreciate the criminality of his actions, he is not acquitted but instead may be found guilty but mentally ill. See 720 ILCS 5/6-2(c) (West 2006).

In my opinion, there are three specific points that demonstrate that the trial judge's questioning was appropriate and within his discretion in this case: (1) the fact that the witness questioned was an expert opining on a material issue; (2) the fact that the trial court stated on the

record that it was not prejudging the expert's opinion or the evidence; and (3) the fact that the trial court's ultimate ruling necessarily accepted in part the defense's position and rejected the State's position.

First, I have no doubt that the trial court had the right to question the defense expert in order to clarify the material issue of defendant's mental health and ability to appreciate the criminality of his actions. *Cf. Palmer*, 27 Ill. 2d at 314-15. I am aware of no case, either in Illinois or nationally, in which the testimony of experts has been held to be subject to more or less questioning by the trial court than that of other witnesses, and this may well be an issue of first impression. It is my opinion that vigorous questioning by the trial court in the context of the key expert witness at a criminal bench trial falls squarely within the category of "bring[ing] enlightenment on material issues which seem obscure." *Palmer*, 27 Ill. 2d at 314-15.

The majority makes much of the fact the trial court interrupted Dr. Frumkin repeatedly and interjected its own questions, in many cases on direct examination and before the State had the opportunity to cross-examine him. Although this behavior is somewhat unusual, I cannot deem it to be an abuse of discretion. The supreme court's cases on this subject do not limit the trial court's questioning to any specific time during a witness' testimony, and I am unaware of any authority that would limit the trial court's discretion to only situations in which the parties have already completed their own examinations of the witness. Indeed, in *People v. Williams*, 173 Ill. 2d 48, 79-80 (1996), the supreme court found that a trial court did not abuse its discretion when it interrupted the direct examination of the defendant in order to clarify what appeared to be an inconsistency with an earlier portion of the defendant's testimony. As the supreme court noted in

that case, "[t]he judge's questions *** did not indicate a bias, prejudice or hostility against defendant. Neither did the judge imply that he found defendant to be not credible. Rather, the judge merely sought to clarify defendant's version of the incident. Under these circumstances, we conclude that the trial judge did not abuse his discretion by questioning defendant ***." *Id.* at 80.

Like *Williams*, the trial court in this case sought only to clarify important points in Dr. Frumkin's testimony that were unclear. As the finder of fact at a bench trial, the trial judge should be allowed considerable leeway to question expert witnesses, especially experts whose opinions bear on material issues and are based on obscure technical knowledge. Dr. Frumkin's opinion bore directly on the dispositive issue in the trial and was based on a detailed understanding of mental health issues as applied to the facts of the case, and the trial court was therefore well within its rights to question Dr. Frumkin extensively regarding the basis of his opinion.

Second, the trial court's questions do not indicate that it had prejudged the evidence or rejected Dr. Frumkin's opinion before hearing all of the evidence. Rather, the record demonstrates that the trial court engaged in an extensive dialogue with Dr. Frumkin in order to clarify the basis of his opinion and to determine what facts the expert considered to be important to his ultimate finding. In my view, the most important exchange is the trial court's statement to the expert, "If I'm going to accept your opinion, *whether or not I do, I don't know yet*, but if I'm going to accept your opinions I need to understand them fully." (Emphasis added.) This statement indicates very clearly that, far from prejudging the outcome and rejecting the defense expert's opinion out of hand, the trial court was actively engaged in weighing the evidence and had not decided anything before hearing all of the evidence.

Additionally, the trial court questioned Dr. Frumkin by offering hypotheticals based on accepting or rejecting certain evidence. For example, the trial court and Dr. Frumkin had the following exchange:

"THE COURT: Let's say I accept the mental disease and defects. Let's say I accept that. How with these set [*sic*] of circumstances, and his conduct, could I determine, according to the statute, that that [*sic*] mental disease or defect, that he lacked substantial capacity to appreciate the criminality of his conduct?

THE WITNESS: Because he would not have had the resources to ever appreciate him doing other sorts of things to get out of that situation. Be it a rational –

THE COURT: Well, that would almost apply to every person that ever killed anyone.

THE WITNESS: Well, except –

THE COURT: There is always the murder would occur in a circumstance under which other actions could have resulted in it occurring?

THE WITNESS: I guess the difference in this case is here someone –

THE COURT: You overlay the disease and the defect, is that what you are saying?

THE WITNESS: Yes, yes."

In my opinion, exchanges like the one above strongly demonstrate that the trial court had *not* prejudged the evidence that the defense expert was offering, but was instead clarifying the

expert's opinion and testing the basis for it in order to determine whether the court, as the finder of fact, would ultimately accept it. Although defendant claims that the court's questioning was "prosecutorial," the record reveals the court's questions to be vigorous yet neutral. The court certainly questioned Dr. Frumkin heavily and sharply, but given the importance of the expert's opinion to the dispositive question in the case, I believe that the trial court was within its discretion to do so.

Finally, I believe that the dispositive fact is that the trial court ultimately *accepted* the defense's position in part, yet rejected the State's position. The defense sought a verdict of not guilty by reason of insanity, while the State sought a verdict of guilty. Both State experts opined that defendant did not suffer from a mental disease or defect that would prevent him from appreciating the criminality of his actions. Had the trial court rejected the opinion of Dr. Frumkin completely, then the trial court would simply have found defendant guilty, in line with the State's position. Yet it did not. The trial court found defendant guilty but mentally ill, which necessarily means that it accepted Dr. Frumkin's opinion that defendant suffered from a mental illness at the time of the crime. The only part of Dr. Frumkin's opinion that the trial court did not accept was that defendant was unable to appreciate the criminality of his actions at the time of the crime, which, as mentioned above, was the subject of considerable discussion between the trial court and the defense expert during the trial and can hardly be said to have been a predetermined outcome.

In his brief and during oral argument, defendant made much of the fact that only Dr. Frumkin, the lone defense expert witness, was questioned by the trial court. The record reveals that the reason for this was that the State's experts had already been either thoroughly cross-

41

examined or had been discredited. In particular, the trial court rejected Dr. Nadkarni's testimony and opinion due to effective cross-examination by defense counsel on the length of time it took Dr. Nadkarni to form his opinion. As the court observed during its ruling:

"Dr. Nadkarni testified that it was his opinion that [defendant] was not manifesting disease or defects sufficient to make him unable to appreciate the criminality of his conduct.

That's my view of his testimony. He took two dates. And I think defense counsel did a a great job cross-examining him on that.

He was unable to reach an opinion when he first began interacting with [defendant].

And none of us can deny that [defendant] went to the RTU right as soon as he got there. He began to take a series of medications as soon as he got to the jail.

\*\*\*

Dr. Nadkarni takes two dates to decide how he is going to approach the case.

The first date he talks about needing additional information, and then we end in his final diagnosis, which talks about substance abuse."

Based on this statement in the record, the trial court felt that it did not need to inquire into the basis of Dr. Nadkarni's opinion because defense counsel had already thoroughly discredited the basis of his opinion.

The majority also finds that the trial court relied on matters outside of the record, giving

42

three examples. Based on my reading of the record, I cannot agree. First, the majority points to the trial court's statement that certain medications are "given proactively for people in incarcerated circumstances." Slip op. at 10. Even assuming that there was no basis for this statement in the evidence, there is also no indication in the record that the trial court relied on this supposed fact in making its ruling. As the majority notes, "[a] determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." *Wallenberg*, 24 Ill. 2d at 354; see slip op. at 34. The problem here is that there is nothing in the record to indicate that the trial court relied on this supposed fact in its ruling. Indeed, this situation is very different from that in *Wallenberg*, in which the trial judge, during pronouncement of the verdict, stated that he found the defendant's testimony not credible because the trial judge knew that no gas stations existed on a certain stretch of road, contrary to the defendant's testimony and without support for that contention in the record. See *id.* Unlike that case, the trial court here did not rely on supposed evidence of proactive administration of drugs when making its ruling, and there is nothing in the record that suggests otherwise.

Second, the majority notes that, when Dr. Frumkin was asked to explain what the DSM IV is, the trial court stated, "I know what it is. Next question." Slip op. at 14. However, the trial court may *sua sponte* take judicial notice of any fact that "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Ill. R. Evid. 201 (eff. Jan. 1, 2011). The DSM IV is the abbreviation for the fourth edition of the

No. 1-09-1585

Diagnostic and Statistical Manual, which is published by the American Psychiatric Association. It cannot seriously be argued that the definition of the abbreviation DSM IV is not subject to judicial notice, and there is nothing improper about the trial court taking notice of this fact. Indeed, the supreme court has taken judicial notice of the DSM IV and its contents several times in its opinions, most recently in *People v. Baez*, 241 Ill. 2d 44, 81 n.4 (2011).

Finally, the majority states that the trial court's rejection of the IQ evidence had no basis in the evidence and was only based on the trial court's personal feelings about such evidence. See slip op. at 34. Yet the trial court's finding on this point is, in fact, based on evidence in the record. During its ruling, the trial court stated the following:

"I want to take a moment and comment aside here, and say the IQ I considered to be a total canard. I don't see the relevance of IQ in this case.

Mental acuity is constantly misrepresented in the circumstances of the testimony that I hear from the witness stand in this building.

*Dr. Coleman did a good job pointing out the fact that a verbal score and the performance score are two separate and different things.*

*And I think it's really important to note that.* ***

Verbal acuity, I have heard it termed in other ways. Environmental capacity to overcome obstacles.

These are all fancy ways of saying life experience, your ability to talk and interact with other people is the only thing that matters to me. And I have no basis to think that that wasn't something [defendant] possessed.

44

In fact, he was even laughing and joking with his siblings immediately prior to the incident, as Mr. Champliss invited his death on the front yard.

But as I said, Dr. Coleman's opinion was that there was paranoia here, and that that paranoia was not sufficient to cause him to not appreciate that his acts were criminal." (Emphasis added.)

When the trial court's statement about IQ is read in context, it is apparent that the trial court's finding was informed by the statements of Dr. Coleman, whose opinions and testimony were received into evidence. There is consequently no basis for the assertion that the trial court relied on its own private knowledge for the IQ finding.

Based on the above facts, I cannot say that the trial court abused its discretion when it questioned the defense expert. The record demonstrates that at no point did the trial court prejudge the evidence in favor of the State. In fact, the trial court ultimately accepted the defense's position in part and rejected the State's position that defendant was guilty and not mentally ill. If anything, it was the State's case that suffered as a result of the trial court's questioning, not defendant's case. Neither defendant nor the majority explain how this anomaly can be squared with their position that the trial court prejudged the evidence in the State's favor. Because of these facts, I do not believe that defendant has carried his burden of demonstrating that the trial court erred.

Contrary to the majority's holding, the record demonstrates that the trial court's ultimate finding of guilty but mentally ill was based on evidence gleaned from all of the witnesses at trial. The trial court did not prejudge the evidence, but instead thoroughly analyzed the central

45

questions in the case, as demonstrated by its statements during its ruling:

"There is a long long history of substance abuse here, and I am sure, and I think counsel's correct in pointing out that that may have had an organic consequence. There is also the Axis Two diagnosis of paranoid personality pathology disorder.

In my view, both those things are mental illnesses.

But are they mental illnesses sufficient in this particular circumstance to obviate or to premise a situation where the defendant lacked the substantial capacity to appreciate the criminality of his conduct?

And I must find today they were not. Running from the scene of the crime, shooting someone that begged you to do it and threatened you immediately before you did it.

Giving false names, asking for attorneys, these were acts not of a person who is delusional or lacks the appreciation, but of a person with mental acuity, an awareness of the wrongfulness of his behavior and generally speaking and [*sic*] understanding of what was going to happen to him had he remained on the scene.

I mentioned earlier that if he had returned to the porch, we would have had a different case, because it's true. The running is a big deal.

The asking for an attorney is a big deal, not because he didn't have right to [*sic*], but because he was aware he had a right to, \*\*\*.

It all flies in the face of what's going on here. But I can't help but know

46

and appreciate that there is mental illness here.

\*\*\*

It's my view that the defendant has an illness. That illness was not anywhere near sufficient to cause him not to understand that what he was doing was a crime, but it exists. It exists. It didn't obviate his responsibility, but it exists in this case."

Rather than an abuse of discretion, in my opinion this case is an example of a trial court that did its utmost to provide defendant with a fair trial by ensuring that it had all of the information that it needed as the finder of fact to make a fair and equitable decision about a complex, material issue. The supreme court is clear that the trial court has the right to do so, and I do not believe that, based on these facts, defendant has demonstrated that the trial court's questioning was partial and prejudicial. I would accordingly find no error, and without error there can be no plain error. Moreover, even if I were to find that the trial court had erred, I do not agree with the majority's decision to order that the case be heard by a different judge on retrial.

Having found that the trial court did not err in questioning the defense expert, I would reach defendant's alternative contention that his trial counsel was ineffective for failing to call as a witness the physician who treated defendant at Cermak Hospital when he was arrested. Defendant argues that this witness' testimony would have provided support for the assertion that defendant was unable to appreciate the criminality of his actions at the time of the offense.

Ineffective assistance of counsel claims are governed by the familiar test articulated in *Strickland v. Washington*, 466 U.S. 668, 694 (1984). See *People v. Jocko*, 239 Ill. 2d 87, 92-93

47

No. 1-09-1585

(2010). Under this two-part test, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Jocko*, 239 Ill. 2d at 92. However, the decision of whether to call a witness is a matter of trial strategy and will generally not support a claim of ineffective assistance of counsel. See *People v. Hobley*, 159 Ill. 2d 272, 305 (1994); *People v. Jones*, 155 Ill. 2d 357, 369-70 (1993).

I would find that defendant's trial counsel was not ineffective. The testimony of the treating physician would have duplicated much of the testimony that was already in evidence, and it would have served little purpose. Indeed, defendant's own argument is that the testimony would only lend support to his contention that he lacked substantial capacity to appreciate the criminality of his actions. Because no new, material evidence would have been introduced by the testimony of the treating physician, there is no reason to believe that defense counsel was professionally deficient for declining to call the treating physician as a witness. I would therefore find that defendant's right to the effective assistance of counsel was not violated.

For the above reasons, I would affirm the judgment of the trial court, and I must therefore respectfully dissent.

No. 1-09-1585

---

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

---

THE PEOPLE OF THE STATE OF ILLINOIS,

        Plaintiff-Appellee,

    v.

CHARLES JACKSON,

        Defendant-Appellant.

---

No. 1-09-1585

Appellate Court of Illinois
First District, Second Division

May 3, 2011

---

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham concurred in the judgment and opinion.
Justice Connors dissented, with opinion.

---

Appeal from the Circuit Court of Cook County.

The Honorable Nicholas Ford, Judge Presiding.

---

Michael J. Pelletier, State Appellate Defender, Office of the State Appellate Defender,
203 North LaSalle Street, 24ᵗʰ Floor, Chicago, IL 60601, (Alan D. Goldberg and Emily E. Filpi, of counsel) for APPELLANT.

Anita Alvarez, State's Attorney, County of Cook, Room 309, Richard J. Daley Center,
Chicago, IL 60602, (Alan J. Spellberg, Kathleen Warnick and Emma Nowacki, of counsel), for APPELLEE.

---