THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAXINE SMITH, Defendant-Appellant.

(No. 12088;

Fourth District—April 3, 1975.

John F. McNichols, J. Daniel Stewart and Daniel D. Yuhas, all of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (James W. Jerz and Edward N. Morris, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMKINS delivered the opinion of the court:

Defendant-appellant Maxine Smith was tried before a jury for the murder of one Frank Nelson. She was convicted and sentenced to a term of 20 to 60 years.

Defendant contends that the evidence fails to establish beyond a reasonable doubt, that she possessed the requisite mental state necessary to sustain the conviction. Section 9—1(a)(1), (2), of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—1) provides in pertinent part:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

> (1) He * * * intends * * * to do great bodily harm to that individual * * *; or
>
> (2) He knows that such acts create a strong probability of death * * * to that individual * * *."

Count I of the indictment charged that defendant shot Nelson with a gun "* * * knowing that such an act created a strong probability of death" to Nelson. Count II charged that the defendant shot Nelson and that she "* * * intended thereby to do great bodily harm to said Frank Nelson."

Sections 4—4 and 4—5 of the Criminal Code (Ill. Rev. Stat. 1971, pars. 4—4, 4—5) define the mental states which are incorporated into the above quoted sections of the statute and provide:

> "§ 4—4. Intent. A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct.
>
> § 4—5. Knowledge. A person knows, or acts knowingly or with knowledge of:
>
> (a) The nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.
>
> (b) The result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct.
>
> Conduct performed knowingly or with knowledge is performed wilfully, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning."

Section 6—3(a) of the Criminal Code provides for an affirmative defense to a crime, which includes as an element of the offense charged one of the mental states above defined, in the following language:

> "§ 6—3. Intoxicated or Drugged Condition. A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:
>
> (a) Negatives the existence of a mental state which is an element of the offense."

The argument in support of defendant's contention is summarized in the statement in her brief that "* * * the totality of the facts now present reveals a combination of intoxication, anger, and jealousy of such magnitude as to suspend entirely the defendant's power of reasoning

and render her incapable of possessing the knowledge and intent required for a murder conviction."

The record in this case is voluminous, and it would serve no useful purpose to recite in lengthy detail the testimony of the various witnesses. The evidence establishes, without question, that the defendant was the owner of the murder weapon, a .357 magnum revolver, and that she shot the victim who died as a result of the wounds inflicted. The evidence also establishes that Nelson had been living with the defendant and her son, Leroy Wilson, for some time prior to the shooting, and that defendant was angry and upset because she had observed Nelson in the company of other women shortly before the incident occurred. Defendant testified that she had no recollection of the shooting. She stated she recalled walking into the bedroom of the apartment, but that her next recollection was that Nelson was on the floor and she was trying to administer first aid to him. She recalled being put into a police squad car and a blood test being taken at Memorial Hospital. The shooting occurred shortly after midnight on the morning of May 22, 1972. She was able to testify in detail about her activities during the 15-hour period immediately preceding her entry into the bedroom where the incident took place. While she denied any recollection of shooting, Leroy Wilson testified that while he and defendant were awaiting the arrival of the police, defendant stated that she had shot Wilson in the leg. Officer Bryant also testified that upon his arrival at the apartment "She stated—uh—the subject was just fakin'. I'd better get him out of there. She was gonna shoot him again." At the police station the jailer asked what the charge was and Officer Kramp responded that he believed it would be attempted murder. Defendant stated, "I shot him, and I'll shoot him again." Several witnesses testified as to defendant's conduct immediately after the shooting. Some were of the opinion that she was intoxicated.

■■ Voluntary intoxication will not provide a defense to conduct which the law regards as criminal unless the intoxication makes impossible the existence of a mental state which is an element of the crime. (*People v. Walcher*, 42 Ill.2d 159, 246 N.E.2d 256.) Intoxication will "negative the essential elements of general intent * * * in a murder case only where it is so extreme as to suspend entirely the power of reason." *People v. Hare*, 25 Ill.2d 321, 326, 185 N.E.2d 178.

■■ The issue is one to be resolved by the jury, as is the issue of the credibility of the defendant as well as the other witnesses who testified. The jury was properly instructed on the issue of intoxication, and the record here establishes that it was warranted in finding that the defendant's acts constituted the crime of murder.

The testimony of Leroy Wilson, the 16-year-old son of defendant, who was present in the apartment at the time of the shooting, was presented to the jury by means of an evidence deposition. Wilson did not actually witness the shooting of Nelson, but his testimony was damaging to the defendant.

Defendant here urges that the trial judge erred in admitting the deposition into evidence and permitting it to be read to the jury because (a) the State failed to exercise due diligence in endeavoring to secure Wilson's appearance at the trial and that this is a requirement which must be met before the deposition of a witness may be used in a criminal proceeding, citing *Barber v. Page*, 390 U.S. 719, 20 L.Ed.2d 255, 88 S.Ct. 1318, and *Pointer v. Texas*, 380 U.S. 400, 13 L.Ed.2d 923, 85 S.Ct. 1065, and (b) the short notice of the taking of the deposition precluded her counsel from adequate preparation for cross-examination.

Supreme Court Rule 414, effective October 1, 1971, provides for the taking of an evidence deposition of a person other than the defendant if it appears to the court that "* * * it is necessary for the preservation of relevant testimony because of the substantial possibility it would be unavailable at the time of the hearing or trial * * *." No Illinois case was cited which incorporates a "diligence" requirement into the procedures of the rule. Conceding, *arguendo*, that the State is required to establish that it exercised due diligence in endeavoring to secure the presence of Wilson for the purpose of adducing his testimony before the jury in person, the record here fails to support defendant's contention.

On September 11, 1972, the trial of this case was commenced. The *voir dire* examination of the jurors was interrupted and one Karen Tate, a daughter of defendant and sister of Leroy Wilson, was sworn and testified that she resided in Milwaukee, Wisconsin, and that Wilson had been residing with her in Milwaukee. She stated that Wilson had told her that he was under subpoena, that she had talked to the Sangamon County State's attorney's office and pursuant to that conversation had brought Wilson to Springfield, Illinois, arriving at 4 A.M. on the morning of September 11. They had checked into the Downtowner Motel and she had last seen Wilson at 11 A.M. when she left the motel. She had not seen him since and had no idea where he was although she had endeavored to find him. The witness also testified that the State's attorney had called Wilson a week before and told him that if he failed to appear they would extradite him. At this juncture the State's Attorney asked the court to recess the proceedings until 9:30 the following morning, September 12, stating "* . * * I wouldn't want to accept this panel until we're assured that Leroy Wilson is available to testify." Pursuant to this request the trial judge recessed the trial. Later on the

same date, at 3:50 P.M., Wilson, outside the presence of the jury, was sworn. He acknowledged that he had been previously served with a subpoena requiring his presence on August 8. The court advised him that the subpoena had been continued in force. The State's attorney advised the court that Wilson had failed to appear on the morning of September 11 and had not been located until 3:40 P.M., and this through the efforts of the State's attorney and two police officers. When asked where he had been during the day of September 11, Wilson responded, "First I went to the house we used to stay at to check on my dogs, and I went to pay my respects to a person I used to stay with." He also stated that he was 16 years of age.

The State's attorney then stated that he desired to have another subpoena served upon Wilson in the presence of the court. Wilson stated that he did not want the subpoena; however another subpoena was read to him. Wilson then asked the trial judge why he had to testify against his mother. The judge responded that all he had to say was that Wilson had to comply with the subpoena. Wilson was then asked if he would appear on the following morning, September 13, and stated that he would. The State's attorney then stated that in view of Wilson's failure to appear in response to the subpoena and his reluctance to testify, he was requesting the court to order Wilson taken into custody by the juvenile authorities and detained until such time as he was called to testify. The trial judge refused this request and again asked Wilson if he would appear the next morning, and Wilson again responded affirmatively. Karen Tate also stated that she would bring him at 9 A.M. The State's attorney then stated, "I also want the record to show that the two young ladies in the front row, one of whom is his sister, when Mr. Skinner tried to serve a subpoena on him they told him not to accept it." To which the judge responded, "Yes, I know, I heard that." The court then asked the State's attorney "[O]f course, you're not going to get to him tomorrow are you?" The response was, "No, we won't." The court then remarked, "You got another problem," and the following colloquy occurred between the State's attorney and the trial judge:

> "The Court: * * * We don't have to pick—swear panels of four do we?
>
> Mr. Kasten: Well, I thought about that later. Now, we could pick them and accept them and swear them at the end.
>
> The Court: And then put him on right away. Are you safe on that?
>
> Mr. Kasten: Well, all the cases say that in a jury trial that the jeopardy attaches when the jury is empanelled and sworn."

It appears from the record that the foregoing proceedings were had

following the recess of the trial and that defendant's counsel was not present. The court then entered the following order:

"People produce LeRoy Wilson, a material witness, in court and request the court to order deposition of LeRoy Wilson because of substantial possibility his testimony will not be available for trial. Court finds from representations of Assistant State's Attorneys that testimony of LeRoy Wlison is relevant and that he may not be available to testify at trial. Deposition ordered. Defendant's attorney notivied [sic] of immediate taking of deposition in Courtroom C. Defendant and her attorney notified of immediate taking of the deposition. Witness subpoenaed in open court to appear at 9 A.M. in Court to testify and admonished to obey subpoena. Deposition taken and ordered filed. Cause continued to 9:30 A.M., September 12, 1972."

The court admonished Wilson that his deposition was to be taken forthwith, and that "I'm not going to take you into custody but I want you to report here at 9:30 tomorrow morning. Will you do that?", to which Wilson responded, "Yes." The evidence deposition was then taken (on September 11). On the morning of September 12th, Wilson was observed in the court house "\* \* \* in the hall \* \* \*" by both the State's attorney and defendant's attorney.

Jury selection was completed on September 12, and one witness was called to lay the foundation for certain of the State's exhibits. On September 13 the State called Leroy Wilson as its first witness. He did not appear. The State then called Robert L. Goby, an investigator for the State's attorney's office, as a witness. He testified that he knew Wilson, that he had gone to the Downtowner Motel before 1 P.M. on the afternoon of September 12, and that "Leroy Wilson was booked in Room 124 along with Karen Tate." The following questions were then asked of Goby and his responses were as follows:

"Q. Now, when you went there yesterday afternoon was that room still booked or reserved or rented by Leroy Wilson and his sister, Karen Tate?

A. Well—uh—specifically, yes—uh—but they had left. When the maid went to check the room—this—this would have been before 1:00 P.M. yesterday—the keys were left there and the luggage was gone and there was nobody there. The hotel had 'em officially—or the motel had 'em as checked out.

A. At 1:00 P.M. yesterday when the maid checked at the room —this is the conditions that were found there.

Q. All right.

A. And then when I was there—uh—I checked the room again;

it was empty and the car—their automobile was gone.

Q. All right. Did you have occasion to check the witness room here in the County Building and the coffee shop in the County Building yesterday to locate Leroy Wilson?

A. Yes, sir, I checked that yesterday, and then I checked it again this morning.

Q. Was he in either of these places?

A. No, sir.

Q. Was he at the motel this morning?

A. No, sir.

Q. Has he been at our office—at the State's Attorney's Office at any time today to the best of your knowledge?

A. Not to my knowledge.

Q. To the best of your knowledge, has Leroy Wilson called our office today?

A. No, I checked with the girls in the office and they said they had received no phone calls today or yesterday afternoon either."

Goby also testified that the room at the Downtowner had been paid for by use of a credit card issued to one John Walker. He also stated that he understood that the city police had checked an address in Springfield in an effort to locate Wilson.

■■ This detailed recital of the efforts of the State to procure the presence of Wilson at the trial demonstrates "due diligence" by any reasonable standard. It is abundantly clear that the State was most anxious to present Wilson's testimony to the jury from the person of Wilson himself and made every effort to do so. We thus find no merit in defendant's contentions to the contrary.

■■ Defendant's attorney was notified at about 4:35 P.M. on September 11 that Wilson's deposition was to be taken immediately. He arrived at the court house at 5 P.M., interviewed Wilson for 10 minutes and the deposition was taken, during which he did cross-examine Wilson. Defendant here contends that such short notice prevented her attorney from adequate preparation for that cross-examination. There is nothing in the record to indicate precisely what preparation needed to be done, nor to indicate any distinction between counsel's preparedness at the time of taking the deposition, and that which would have obtained at 9:30 the following morning had Wilson appeared and testified. In addition, on July 25, 1972, the State, in response to a request by defendant's attorney, had furnished to him a mass of material. Included was the transcript of Wilson's testimony given at the coroner's inquest, and which contained essentially the same version of the incident as he related in the deposition. Defense counsel had also been furnished with a transcript

of Wilson's testimony before the grand jury which was essentially the same as that given on deposition. Defense counsel had also been furnished with a copy of a signed statement given by Wilson to the police in which he essentially related the same version of the incident as he did on deposition. In short, the record demonstrates that defense counsel had as much information as the State did concerning Wilson's knowledge of the case prior to the taking of the deposition, and had about as much forewarning of the fact that the deposition would be taken. Under these circumstances there was no error in the admission of the deposition into evidence and the reading of the deposition to the jury.

■■ Defendant also contends that the manner in which the deposition was read to the jury was prejudicial to the defendant. This contention is predicated upon the fact that one assistant State's attorney read the questions and another read the answers. There is no contention that undue emphasis was placed on any question or answer by either. This method of presenting the deposition to the jury was not objected to at the trial, nor was it mentioned in the post-trial motions. There is no error demonstrated, and the point merits no further discussion.

■■ Lastly, defendant claims that the minimum sentence is excessive and should be reduced. The record indicates that defendant's behavior during her incarceration awaiting trial had been excellent, that she is a licensed practical nurse, and that she had come to the aid of a visitor in the sheriff's office who suffered a heart attack. There was no proof of prior criminal conduct. Here the sentence imposed is within the limits prescribed by the legislature, the defendant stands convicted of the crime of murder, and we cannot say that the penalty imposed constitutes a great departure from the fundamental law and its spirit and purpose, and we therefore decline to disturb the sentence imposed by the trial judge. *People v. Taylor*, 33 Ill.2d 417, 424, 211 N.E.2d 673.

Judgment affirmed.

GREEN and TRAPP, JJ., concur.