2025 IL App (2d) 240405-U
No. 2-24-0405
Order filed October 3, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-2301 |
| GETZURI ARELLANO, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*: We reverse defendant's conviction, following a bench trial, of first degree murder (knowledge of a strong probability of death or great bodily harm) for fatally strangling his girlfriend. The trial court committed plain error in basing the conviction on its knowledge of prior court cases involving strangulation, and the evidence was closely balanced on whether defendant acted with the requisite knowledge.

¶ 2     Following a bench trial in the circuit court of Kane County, defendant, Getzuri Arellano, was found guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) and sentenced to a 29-year prison term. Defendant argues on appeal that the trial court erred by (1) relying on personal knowledge not based on the evidence presented at trial and (2) refusing to consider

evidence of defendant's voluntary intoxication. Because we agree with the first argument, we reverse and remand for a new trial.

¶ 3                                      I. BACKGROUND

¶ 4     Defendant was charged by indictment with two counts of first degree murder. Count I charged defendant with intentional first degree murder (intentional murder) (*id.* § 9-1(a)(1)), and count II charged him with knowing first degree murder (knowing murder) (*id.* § 9-1(a)(2)). Specifically, count I alleged that defendant, with the intent to kill or do great bodily harm to Natalie Jimenez, strangled her, causing her death. Count II likewise alleged that defendant strangled Jimenez, causing her death, but that he did so knowing that his acts created a strong probability of death or great bodily harm.

¶ 5     The State filed a pretrial motion *in limine* to bar defendant from presenting evidence of his voluntary intoxication. The State contended that defendant planned to elicit testimony that he was intoxicated the night Jimenez was killed. According to the State, defendant was trying to "back door" a voluntary intoxication defense, which the State claimed was barred by section 6-3 of the Criminal Code of 2012 (Code) (720 ILCS 5/6-3 (West 2022)). At the hearing on the motion, the State conceded that under our supreme court's decision in *People v. Grayer*, 2023 IL 128871, evidence of voluntary intoxication is potentially admissible in a prosecution for a specific-intent crime. However, the State contended that such evidence was inadmissible in prosecutions for general-intent crimes. The State took no firm position on whether intentional murder is a specific-intent crime. However, the State maintained that knowing murder is a general-intent crime for which evidence of voluntary intoxication is inadmissible. Defendant did not dispute the State's position that evidence of voluntary intoxication is inadmissible in prosecutions for general-intent

crimes. Defendant instead maintained that intentional murder is a specific-intent crime for which evidence of voluntary intoxication is admissible.

¶ 6 The trial court concluded that evidence of voluntary intoxication is admissible in a prosecution for intentional murder because it is a specific-intent crime. The court drew the opposite conclusion regarding knowing murder. However, because the State had charged both intentional murder and knowing murder and defendant had demanded a jury trial, the court added: "I believe there will have to be [a jury] instruction that any evidence of voluntary intoxication does not apply to the verdict in [c]ount [II] [charging knowing murder], and we'll have to make sure that the jury verdict forms read appropriately." The court's written order on the motion *in limine* did not specifically bar any evidence. It merely recited the court's conclusion that intentional murder, as charged in count I, was a specific-intent crime, whereas knowing murder, as charged in count II, was a general-intent crime.

¶ 7 Defendant subsequently waived his right to a jury trial, and the State elected to proceed only on count II, charging knowing murder. During his opening statement, defense counsel stated, without objection, that defendant "smoke[d] a couple of blunts" a few hours before Jimenez was killed.

¶ 8 In the State's case, Zachary Kavcar testified that on December 9, 2020, he was an officer with the Aurora Police Department. At 4:14 a.m. on that date, Kavcar and his field training officer, Cory McCue, were dispatched to a residence on Indian Avenue to assist with an ambulance call. Once there, he encountered defendant, who was distraught and crying. Defendant kept saying. " 'It's all my fault.' " Kavcar looked in the bathroom and saw Jimenez on the floor of the shower. She was unresponsive. At some point, Officer Jesus Macias and Officer Murphy (first name not given) arrived. Kavcar, McCue, and Murphy proceeded to administer life-saving measures, but

Jimenez did not respond. Members of the Aurora Fire Department took over the task of trying to revive Jimenez. She was transported to a hospital, where she later died.

¶ 9　　According to Kavcar, defendant reported that he and Jimenez "got into an argument and then she fell." Kavcar asked defendant why Jimenez fell. Kavcar stated that he had grabbed Jimenez by the neck and she fell when she tried to pull away from him. McCue and Macias also testified, as did yet another officer dispatched to the scene. Their testimony was generally consistent with Kavcar's.

¶ 10　　Forensic pathologist Dr. Mitra Kalelkar testified that she performed an autopsy on Jimenez and concluded that Jimenez died as a result of strangulation (her autopsy report was not admitted into evidence). Kalelkar reviewed the results of a CT scan that was performed on Jimenez on December 9, 2020, at the hospital where she had been transported. The scan revealed cerebral edema, which was consistent with oxygen deprivation due to asphyxia from strangulation. In addition, a blood flow study conducted at the hospital showed insufficient blood flow to Jimenez's brain.

¶ 11　　Kalelkar also testified to the results of her physical examination of Jimenez. She noted petechial hemorrhages on Jimenez's face and in her eyes. Kalelkar explained that petechial hemorrhages are "pinpoint or dot-like hemorrhages" that occur "when there is a lot of pressure, like a neck compression, that enlarges the tiny capillaries which burst and that causes the hemorrhage." Petechial hemorrhages are "usually a sign of asphyxia," which in turn can be caused by, *inter alia*, compression of the neck. In Jimenez's case, according to Kalelkar, asphyxia was caused by compression of her neck.

¶ 12　　Kalelkar also observed abrasions and contusions on Jimenez's neck that she opined were caused by human fingers pressed against Jimenez's neck. There were no injuries to the trachea or

the hyoid bone. Kalelkar testified that it takes one-and-a-half to two-and-a-half minutes for a person to lose consciousness as a result of consistent neck pressure. Whether a person becomes unconscious during that time depends on the amount of pressure. Kalelkar stated that there was no way to know how much pressure was applied to Jimenez's neck.

¶ 13 Kalelkar's internal examination, conducted after Jimenez's scalp was retracted, revealed no injury to her head or scalp. Kalelkar saw no indication that Jimenez had fallen and hit her head.

¶ 14 The State admitted into evidence numerous photographs of Jimenez taken either while she received treatment or after her death.

¶ 15 Forensic pathologist Dr. Larry Blum testified for the defense. He reviewed, *inter alia*, various reports generated in connection with Jimenez's death, including the autopsy report prepared by Kalelkar. Blum also prepared a report of his own (which was admitted into evidence) concerning Jimenez's death. Blum testified consistently with his report. Blum agreed with Kalelkar that strangulation was the cause of Jimenez's death. In his report, he noted contusions, which he described as "faint," on the left side of Jimenez's neck. He noted that "[a] faint contusion might indicate a lessor [*sic*] force than a larger, more deeper [*sic*] bruise for instance." He further noted an area of hemorrhaging that appeared to be associated with emergency medical treatment. Blum observed no damage to the trachea or larynx, and he explained the significance of that "absence of trauma":

"[I]f one is to assess the degree of force used in a particular manual strangulation, one of the ways that one can assess the amount of force is to see how much blunt trauma is done to the neck area, and if there is [*sic*] no fractures there, that would point the needle in the direction of lesser force than more force, so it's significant in that role.

A person can certainly be asphyxiated without having their windpipe crushed because that takes about 33 pounds of pressure, whereas to occlude the thin wall veins in the side of the neck takes about 4.4 pounds of pressure. ***.

*** [S]o to assess the amount of force with any one particular case, one assesses the bruises, the abrasions, which are described in this case as superficial, the bruise was faint, there were no fractures and the hammering of the neck was localized and small to one spot by the hyoid and thyroid ***."

Blum did not quantify the amount of force used to strangle Jimenez, but he opined that, on the spectrum of "lesser" to "greater" force, a lesser force was applied.

¶ 16    Based on his estimate of the amount of force used, Blum opined to a reasonable degree of medical certainty that it would take anywhere from 9 to 13 seconds for Jimenez to lose consciousness under such force. According to Blum:

"If the edema, swelling, hemorrhage, if all these processes that are initiated by causing the person to go unconscious, if that continues, *even without holding onto the neck, even without the pressure applied*, if these continue to interfere with the body's oxygen supply, the second thing that can happen is respiratory arrest and that happens when the lungs quit functioning, ***." (Emphases added.)

According to Blum, Jimenez "did suffer a respiratory arrest at some point during [the] event."

¶ 17    On cross-examination, Blum was asked about the following portion of his report:

"The time interval from the application of force (to the neck) to loss of consciousness, can be as little as nine (9) seconds per the forensic medical literature. Usually, this interval does not exceed thirteen (13) seconds. If the applied neck pressure is released upon the victim's loss of consciousness, recovery is expected. If, however, the

pressure is maintained for an indeterminate amount of time, either knowingly or unknowingly, brain function can deteriorate leading to respiratory arrest. Generally, this takes from one and one half to two- and one-half minutes (1.5 to 2.5 minutes from the start of the strangulation process), however, the pressure need not be applied for the entire time."

¶ 18 Blum denied that his report stated that it takes one-and-a-half to two-and-a-half minutes of pressure for death by strangulation to occur. He clarified that it takes one-and-a-half to two-and-a-half minutes for respiratory arrest to occur. However, this "does not mean that the hands ha[ve] to be on there that long." Blum explained:

"The initial injury to the neck, compression of the veins, compression of the nerves in the neck include the *** carotid sinus nerves, along with the edema, the swelling and the bleeding that we saw in the neck area, can all combine to keep oxygen from going into the body that can result in respiratory arrest. It does not mean that the person has to stand there for a minute and a half to two and a half minutes squeezing the neck, absolutely not."

¶ 19 Asked if constant pressure might have been applied to Jimenez's neck for one or two minutes, Blum responded:

"Any time you give it is possible. What I am saying is it doesn't take that much time to go. ***.

If you apply pressure, external pressure, on someone's neck, in other words, compress the neck, that's unpredictable and the outcomes may be unexpected and unintentional."

¶ 20 Blum later explained:

"The outcome here was death. *** [Y]ou can have various outcomes from the application of hands on somebody's neck. It could be nothing, they might not even loose [*sic*]

consciousness, they could loose [*sic*] consciousness, they could go into respiratory arrest, they can go into cardiac arrest, it could be lethal, \*\*\*."

Blum acknowledged that "[e]verything else being equal," "the longer pressure is applied, the more likely it is to result in respiratory failure[.]"

¶ 21    Defendant testified that he and Jimenez were in a romantic relationship and had a son.  In 2017, while Jimenez was pregnant, she moved in with defendant and his mother.  When Jimenez gave birth, she and defendant moved to a new home.  Defendant's brother Johnny also resided with defendant and Jimenez except for six to eight months while he was in a "military program."  Defendant testified that he and Jimenez smoked marijuana regularly.

¶ 22    On December 8, 2020, after dinner, defendant and Jimenez smoked marijuana together.  Jimenez took a shower and went to the bedroom.  Defendant testified that he gave Jimenez's phone to their son to watch videos.  At that point, Jimenez was asleep.  After retrieving the phone from their son, defendant noticed that an internet browsing app was open and displaying translated text that he found disturbing.  Confused about the situation, he went outside and smoked several blunts and did "did a few dabs" with "THC oil, stronger than marijuana."

¶ 23    When defendant went back inside, he left Jimenez's phone on her nightstand with the app open so that she would know what he had seen.  He then got into bed with Jimenez.  Defendant woke up when Jimenez shoved his shoulder and asked him why he had been on her phone.  Defendant told her that they would talk about it later, but Jimenez started hitting him on the side of the head.  She then went into the bathroom.  Defendant followed her and tried to persuade her to smoke some marijuana to calm down.  Defendant left the bathroom but returned to offer to take Jimenez to work.  At that point, she shoved defendant into the shower area.  Jimenez started insulting defendant and threatening to leave with their son.  Defendant then began showing her the

concerning material he found on her phone. She responded by hitting his head with her fist. Defendant brought his hands up to his face, at which point Jimenez kicked his testicles and he fell back toward the sink. He then put his right hand on Jimenez's neck and pushed her toward the corner of the shower. He used his elbow to restrain her arm against the shower wall and used the side of his legs to keep her from kicking him. Defendant testified:

"The next thing I know, that's when her arm eased. I felt, like, her arm ease, and I let go and she slipped out—she was slipping out of my—she was just slipping, and I tried to catch her body. And while I was trying to catch her body, like, I felt her back—her head—the back of her head went sideways and back, and hit the shower area. ***."

¶ 24 Defendant tried to revive Jimenez and then went to Johnny's bedroom to get help. Defendant attempted to perform CPR and had Johnny call 911. Defendant recalled that, when police officers arrived, he told them it was "all [his] fault." He was "banging on the walls and *** crying."

¶ 25 Before closing arguments, the trial court ruled that it would permit defendant to argue (1) self-defense and (2) second degree murder based on a mitigating factor. During defendant's closing argument, counsel's description of the events preceding the incident included mention of defendant's and Jimenez's marijuana use. About the incident itself, counsel argued as follows. When Jimenez started striking, shoving, and kicking defendant, defendant "in an effort to restrain her from further blows, put[ ] his hands around her neck" and "she [went] limp." The absence of damage to the hyoid bone, the esophagus, or the cartilage surrounding the larynx indicated that defendant did not apply the 33 pounds of pressure necessary to inflict such damage and, thus, suggested that defendant was unaware of a strong probability that placing his hand on Jimenez's neck would cause her death or great bodily harm. According to counsel, "If [defendant] didn't

know that he was going to cause death or great bodily harm, all he was doing was defending himself from [Jimenez's] repeated blows and *** kicking." Counsel further argued:

> "Now, if indeed *** this case has failed in the [c]ourt's findings as to first degree murder, [Y]our Honor—and this is not a lesser included offense. It is a mitigating aspect of first degree murder. When one is found guilty of murder, of first degree murder at the time of the killing, [defendant] is acting under a sudden and intense passion that results from a serious provocation."

¶ 26    In finding defendant guilty, the trial court determined that there was no dispute that defendant caused Jimenez's death and that the cause was strangulation. The court further found that defendant did not act in self-defense. First, the court noted that defendant "had no evidence on his person that he was in any type of struggle." Second, the court rejected defendant's testimony that he grabbed Jimenez's neck only after she kicked him in the groin. The court reasoned that "[t]hat is not generally the reaction one has to being kicked in the groin." The court concluded that defendant was the "pursuer" and the "aggressor."

¶ 27    The trial court then turned to the question of whether defendant acted with knowledge that his acts created a strong probability of death or great bodily harm. The court noted that Blum described certain injuries to Jimenez as "faint." The court disagreed, observing that the photographs in evidence showed bruises and petechiae on Jimenez that were not faint even after several days. The court added:

> "Another thing to note is the extent of the petechiae. I am allowed to use my common sense and experience when I decide these matters, and I have participated in cases where strangulation was an issue? [*sic*] And I have seen cases where there have been petechiae in the eyes.

I don't recall a case where there's been petechiae so extensive down the entire face and neck. To me, that means that the act of strangulation was longer rather than shorter in duration because the pressure buildup which causes the petechiae must have been immense.

There's testimony that it takes, I think, 9 to 30 seconds for someone to lose—or 9 to 15 seconds, I don't recall, to lose consciousness. But longer than that, causes respiratory failure.

In this case, had *** defendant released his grip in those 9 to 15 seconds or 9 to 30 seconds after *** [Jimenez] lost consciousness, there's *** a high likelihood that she would recover. The testimony was of that nature. That is, of course, not what happened here. She never recovered.

He applied pressure to her neck for such a duration of time that she went limp in his arms, and then he, by his testimony, let her down to the floor. The fact that he kept pressure on her neck long enough to accomplish that and to cause the extensive petechiae in her face and eyes and neck, show [*sic*] that this was an event of longer rather than shorter duration.

In addition, the nature of the fingerprints on her neck, the bruising on her neck, it shows—There was some testimony about the amount of pressure used. Dr. Blum said it was a lesser amount of pressure. Dr. Kalelkar, if I recall correctly, said it could not be determined how much pressure was used, but he [*sic*] did agree on the amount of pressure it would take, for instance, to crush the trachea. But in this case, the trachea was not the site with the most trauma.

*** The arteries were compressed, not the trachea, and the blood flow was cut off, not the air supply. *** So, again, this is something that lasted longer rather than shorter."

Finally, the court rejected the argument that defendant was acting under a sudden and intense passion resulting from serious provocation. The court explained that the only "applicable" provocation would be mutual combat, of which the court found no evidence.

¶ 28                                   II. ANALYSIS

¶ 29    Defendant first argues that, in finding him guilty, the trial court improperly relied on evidence from other cases it presided over. The State responds that defendant forfeited the issue by failing to both (1) contemporaneously object to the trial court's reference to the purportedly improper evidence and (2) raise the issue in his posttrial motion. Defendant responds that he had no opportunity to raise a contemporary objection because it occurred during the "verdict." Defendant maintains that he adequately raised the issue in his posttrial motion, even though he did so in connection with his challenge to the sufficiency of the evidence. He alternatively claims that the issue is reviewable under the plain error rule. We find the issue forfeited but nonetheless reach it under the plain error rule.

¶ 30    The plain error rule allows appellate review of a forfeited error when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error
> alone threatened to tip the scales of justice against the defendant, regardless of the
> seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious
> that it affected the fairness of the defendant's trial and challenged the integrity of the
> judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225
> Ill. 2d 551, 565 (2007).

¶ 31    We first consider whether a clear or obvious error occurred. As noted, in finding defendant guilty, the trial court specifically referred to its experience in other cases involving strangulation, noting that it had never seen petechiae on the face and neck as extensive as those in this case. The

court concluded that "the act of strangulation was longer rather than shorter in duration because the pressure buildup which causes the petechiae must have been immense."  The only arguable support for the court's assertion that the extent of petechiae correlates with the amount of pressure applied was Dr. Kalelkar's statements that "petechia happens from an increased pressure" and "petechial hemorrhages occur "when there is a lot of pressure, like a neck compression, that enlarges the tiny capillaries which burst and that causes the hemorrhage." However, Dr. Kalelkar's most pertinent testimony on the point in question contradicted the court's conclusion that the pressure must have been "immense" based on the extent of petechiae here: "Q You don't have any idea as to what degree of pressure was applied to the neck? A No, it is impossible to measure the degree of pressure in a human being."

¶ 32    Even if a medical expert deemed reasonable the scientific opinion that the extent of petechiae indicates the amount of pressure applied to a victim, to be admissible, such an opinion would require expert testimony to that conclusion. No such expert testimony was elicited; the scientific opinion was supplied not by a witness, but by the trial court. The court's conclusion was not only unsupported by evidence in the record, it was well outside the ambit of common sense or experience, and it was supported only by the court's recollection of evidence presented in other cases. As such, the court impermissibly relied on evidence not presented at defendant's trial or subject to investigation or cross-examination.

¶ 33    A case cited by defendant, *People v. Jackson*, 409 Ill. App. 3d 631 (2011), is instructive. Following a bench trial, the defendant, who was charged with first degree murder, was found guilty but mentally ill. *Id.* at 632. The trial court rejected the defendant's defense of insanity, which was supported by the testimony of an expert in forensic psychology. *Id.* at 634, 645. The *Jackson* court reversed the defendant's conviction and remanded for a new trial before a different judge. *Id.* at

650. The court did so, in part, because the trial court "relied on matters outside the trial record" in rejecting the opinion of the defendant's expert. *Id.* at 649-50. Notably, the trial court relied on its own understanding of the " 'DSM IV' "[1] and did not permit the defendant's expert to testify about that publication. *Id.* at 638-39. The trial court also discounted the significance of antipsychotic medication that had been prescribed for the defendant, asserting, without evidence, that such medication was administered proactively for people in custodial settings. *Id.* at 637. The trial court also discounted evidence of the defendant's IQ, stating that it found the evidence to be " 'a total canard.' " *Id.* at 645. Forsaking evidence for its experience in unrelated cases, the trial court proclaimed that " '[m]ental acuity is constantly misrepresented in the circumstances of the testimony that I hear from the witness stand in this building.' " *Id.* at 650.

¶ 34    The State cites *People v. Johnson*, 2023 IL App (4th) 220201, ¶ 59, for the proposition that, "[i]n a bench trial, the trial court is permitted to consider its own life and experience in ruling on the evidence." (Internal quotation marks omitted.)  In contrast, "[a] determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962).  In *Johnson*, the trial court relied on its life experience in raising children to conclude how a child might communicate about being sexually assaulted. *Johnson*, 2023 IL App (4th) 220201, ¶ 15.  While acknowledging that "[t]he line between permissibly relying on one's own life experience versus improperly relying on

_____

[1]As the dissenting justice explained, "the DSM IV is the abbreviation for the fourth edition of the Diagnostic and Statistical Manual, which is published by the American Psychiatric Association." *Jackson*, 409 Ill. 3d at 656 (Connors, J., dissenting).

private knowledge may not always be clearly defined," the *Johnson* court concluded that "[h]ere, *** the trial court's comments fell on the right side of the line." *Id.* ¶ 60. Here, in contrast, the trial court's remarks clearly fell on the other side of the line. The court's exposure to evidence in other cases (the extent of petechiae due to strangulation) was not part of the court's life experience in the sense that raising children would be. The court's conclusion, based on evidence in other cases, that the petechiae on the victim's face and neck correlated with the amount of pressure applied to Jimenez's neck ("immense," according to the court) and the length of time defendant applied that pressure ("longer rather than shorter," according to the court) is well outside the ordinary life experience of one not in the medical profession or similarly trained.

¶ 35    We know nothing about the other cases in which the trial court observed petechiae on strangulation victims. Defendant had no way of comparing the extent of the petechiae in those cases to the one here. It is unknown if any witnesses in those cases offered testimony correlating petechiae with the amount of pressure applied to a strangulation victim's neck, the length of time the neck was compressed, or, perhaps, the individual characteristics of the victims. The evidence the trial court relied on was not subject to cross-examination or tested by the rules of evidence in this case. The court's remarks were a clear and obvious error.

¶ 36    We further conclude that the evidence in this case was closely balanced enough that the error threatened to tip the scales of justice against defendant. Although there appears to be no dispute that defendant's act of compressing Jimenez's neck caused her death, his culpability hinged on whether he acted with knowledge that doing so created a strong probability of death or great bodily harm. The strongest evidence that he did was Kalelkar's testimony that it takes one-and-a-half to two-and-a-half minutes for a person to lose consciousness from consistent neck pressure. One can infer that someone applying pressure to another individual's neck for that

- 15 -

amount of time would recognize that he or she was seriously endangering that individual's life or health. Likewise, Kalelkar's testimony that petechiae occur "when there is a lot of pressure, like a neck compression" is relevant to defendant's mental state. The more pressure defendant applied to Jimenez's neck, the more likely he knew there was a strong probability of death or great bodily harm.

¶ 37    In contrast, however, Blum testified that pressure applied to Jimenez's neck for as little as 9 to 13 seconds *could* have resulted in her death. We emphasize "could" because, as Blum acknowledged, his report stated that if the pressure were released upon loss of consciousness, the victim would be "expected" to recover. Blum stressed, however, that the outcome of applying even a small amount of pressure to another's neck is unpredictable. His testimony might very well have been enough to leave the trier of fact with a reasonable doubt as to whether defendant acted knowingly. Although he did not attempt to quantify the amount of force used to compress Jimenez's neck, Blum opined, based on the superficial injuries to Jimenez's neck, that "definitely *** a lesser amount of force" was exerted.

¶ 38    The trial court concluded that defendant applied significant force for a significant period of time. In doing so, the court noted the portion of Blum's report indicating that recovery would be "expected" if pressure were released from one's neck upon loss of consciousness. However, the court rephrased the report's language, finding that there would be a "high likelihood" of recovery. The court also took issue with Blum's characterization of certain injuries as "faint."

¶ 39    Although the trial court's concerns about Blum's testimony were not unreasonable, we cannot determine whether the court would have viewed Blum's testimony differently had it stayed with the trial evidence and not detoured to consider its experience in unrelated cases. Although there was indeed evidence in this case—Kalelkar's testimony—that petechiae occur "when there

is a lot of pressure," the court improperly relied on its observation of petechiae in other cases to conclude that "the pressure buildup which causes the petechiae must have been *immense*." (Emphasis added.) There was no evidence here supporting that characterization. More importantly, the court's reliance on prior cases appears to have influenced the weight it gave to Blum's testimony that force was applied to Jimenez's neck only for a brief period. Although the cause of Jimenez's death is undisputed, had the court relied solely on the evidence presented in this case and refrained from drawing conclusions based at least in part on observations in other cases, it is entirely conceivable that the court would have found a reasonable doubt as to whether defendant acted knowingly. The court's improper reliance on information garnered from other cases might have tipped the scales of justice against defendant. Accordingly, defendant's conviction must be reversed, and he is entitled to a new trial.

¶ 40     Although the trial court's improper and prejudicial reliance on matters outside the record is in itself grounds for reversal, we briefly consider whether, and for what purposes, evidence of defendant's voluntary intoxication is admissible, as the question could arise on remand. Defendant's posttrial motion did not raise any issue related to the court's alleged refusal to consider evidence of voluntary intoxication. This omission would ordinarily forfeit appellate review (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but "forfeiture is a limitation on the parties, not the court, and we may address a forfeited issue where necessary to obtain a just result or maintain a sound body of precedent" (*People v. Seymore*, 2025 IL App (2d) 240616, ¶ 19). Here, the comparably important interest of judicial economy counsels that we provide some guidance on the issue to avoid the risk of a future reversal.

¶ 41     Since 2002, section 6-3 of the Code (720 ILCS 5/6-3 (West 2002)) has provided that "[a] person who is in an intoxicated or drugged condition is criminally responsible for conduct unless

such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." While it is clear that voluntary intoxication does not excuse criminal "conduct," the extent to which voluntary intoxication can *negate* the conduct that would otherwise give rise to criminal responsibility is a separate issue. " 'Conduct' " is defined as "an act or a series of acts, *and the accompanying mental state*." (Emphases added.) *Id.* § 2-4. So, what is the impact of section 6-3 if voluntary intoxication renders the defendant incapable of forming the mental state necessary to make the proscribed act criminal?

¶ 42    In *People v. Grayer*, 2023 IL 128871, our supreme court offered a partial answer based on the statutory defense of intoxication as it existed before 2002. At that time, section 6-3(a) of the Code (720 ILCS 5/6-3(a) (West 2000)) provided that voluntary intoxication did not relieve a defendant of criminal responsibility for conduct *unless* the intoxication was "so extreme as to suspend the power of reason and render [the defendant] incapable of forming a *specific intent* which is an element of the offense[.]" (Emphases added.) The *Grayer* court observed:

> "Under this version of section 6-3, a defendant could raise his or her state of intoxication *** as an affirmative defense. *** Voluntary intoxication *** could be raised as an affirmative defense to specific-intent crimes. Raising the defense triggered the State's burden to not only prove the elements of the crime but also to disprove the defense. [Citation.]
>
> ***
>
> However, the amendment to section 6-3 does not mean evidence of voluntary intoxication is barred from being introduced at trial to negate the State's evidence of intent *for specific-intent* offenses. The amendment had no effect on the State's burden of proving

all elements of the charged offense beyond a reasonable doubt, including the requisite mental state." (Emphases added.) *Grayer*, 2023 IL 128871, ¶¶ 21, 23.

¶ 43 The *Grayer* court explained the distinction between specific and general intent: "general intent offenses *** only require that the prohibited result be reasonably expected to flow from the accused's voluntary act," while "specific-intent offenses require the State to prove that a defendant intended to commit the stated offense." *Id.* ¶ 23. The *Grayer* court did not explicitly decide whether voluntary intoxication can ever negate the mental state for a general-intent crime. However, in *People v. Smith*, 26 Ill. App. 3d 1062, 1065 (1975), where knowledge was the requisite mental state in a murder prosecution, the jury was instructed on voluntary intoxication. The court upheld the defendant's conviction, holding that there was insufficient evidence that the defendant's intoxication was "so extreme as to suspend entirely the power of reason." *Id.*

¶ 44 Furthermore, even if voluntary intoxication does not constitute an affirmative defense or is inadmissible (as a matter of fact or law) on the question of whether a defendant charged with knowing murder possessed the requisite mental state, it does not follow that such evidence is categorically inadmissible for any purpose whatsoever in a prosecution for that offense. For instance, such evidence may be relevant to whether a defendant charged with first degree murder acted under the actual but unreasonable belief in the need for self-defense, thereby reducing the offense to second degree murder. See *People v. Rutigliano*, 2020 IL App (1st) 171729, ¶ 73. Voluntary intoxication might also be relevant to the weight to be given to a defendant's potentially incriminating statements. On remand, should the State again move to bar evidence of voluntary intoxication, the trial court should consider these matters in crafting its ruling.

¶ 45                                        III. CONCLUSION

¶ 46    For the reasons stated, we reverse the judgment of the circuit court of Kane County and remand the case for a new trial.

¶ 47    Reversed and remanded.